In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 08-1351 & 06-3901

WISCONSIN ALUMNI RESEARCH FOUNDATION,

*Plaintiff-Appellee/*
*Cross-Appellant,*

*v.*

XENON PHARMACEUTICALS, INC.,

*Defendant-Appellant/*
*Cross-Appellee.*

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 05 C 242—**Barbara B. Crabb**, *Chief Judge.*

ARGUED DECEMBER 8, 2008—DECIDED JANAURY 5, 2010

Before EASTERBROOK, *Chief Judge*, and BAUER and
SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. This case arises out of a complex
set of contractual relationships between the Wisconsin
Alumni Research Foundation, the patent-management
entity for the University of Wisconsin; certain research

scientists at the University; and Xenon Pharmaceuticals, a Canadian drug company. The Foundation and Xenon jointly own the patent rights to an enzyme that can lower cholesterol levels in the human body. The enzyme's cholesterol-reducing benefits were discovered and confirmed by scientists at the University whose research was sponsored in part by Xenon. In 2001, pursuant to an option agreement between the Foundation and Xenon, the Foundation gave Xenon an exclusive license to commercialize this discovery and market any resulting products in exchange for a share of the profits.

The Foundation brought this suit against Xenon alleging violations of its contract rights and seeking damages and declaratory relief. First, the Foundation alleged that Xenon sublicensed its interest in the patented enzyme to a third party but refused to pay the Foundation a percentage of the sublicense fees as required under the 2001 license agreement. Second, the Foundation alleged that Xenon wrongly asserted ownership over a set of therapeutic compounds developed from the jointly patented enzyme; the Foundation claimed that it owned rights to these compounds pursuant to its network of written agreements with Xenon and the University researcher who confirmed the therapeutic benefits of the compounds. Xenon counterclaimed against the Foundation, and on cross-motions for summary judgment, the district court ruled in the Foundation's favor on the breach-of-contract claim and in Xenon's favor on the dispute over ownership of the compounds. A jury awarded $1 million in damages for the breach of contract; the Foundation accepted $300,000 after Xenon successfully moved for remittitur. Both parties appealed.

We affirm in part and reverse in part and remand for entry of judgment consistent with this opinion. The district court properly granted summary judgment for the Foundation on the breach-of-contract claim. Xenon breached its license agreement with the Foundation by granting a sublicense in the jointly patented enzyme to a third party without paying the Foundation its share of the sublicense fees. A subsidiary issue is whether Xenon's breach triggered the Foundation's right to terminate the agreement. We conclude that the district court should not have voided the Foundation's attempt to do so; the Foundation was entitled to and properly terminated the agreement. We also conclude the district court erroneously entered judgment for Xenon on the issue of the Foundation's claim to an ownership interest in the compounds. Under the web of contracts at issue here, the Foundation was entitled to a declaration of its ownership interest in the compounds.

## I. Background

Researchers at the University of Wisconsin became interested in an enzyme called Stearoyl CoA Desaturase ("SCD") because of its potential to help treat diabetes, obesity, and other diseases by lowering cholesterol. In 1999 the researchers discovered that suppressing SCD levels in the human body lowered cholesterol levels. Pursuant to University policy, the researchers disclosed their research results to the Foundation and in January 2000 signed a Memorandum Agreement assigning all their rights in the discovery to the Founda-

tion. The next month, the Foundation filed a provisional patent application for the discovery.

Meanwhile, Xenon, a Canadian pharmaceutical company that was collaborating with the University on research into a separate enzyme, learned of the University's discoveries and expressed interest in jointly pursuing SCD research. The University and Xenon entered into a series of research agreements (referred to as Research Agreements 1, 2, and 3) in which Xenon agreed to jointly sponsor various SCD research projects with the University. Each research agreement identified the scope of the research, the principal researcher, the expected cost, and the period of performance.[1] These agreements also referred to a separate Sponsor Option Agreement between the Foundation and Xenon that governed ownership of any discoveries arising from the joint research program. The Sponsor Option Agreement cross-referenced the contracts between the Foundation and the individual University researchers requiring the researchers to assign to the Foundation any property rights in the discoveries emanating from the research and gave Xenon an exclusive option to license any resulting

---

[1] The joint research program ran into problems in November 2002 when Xenon and the University became embroiled in a funding dispute. The University claimed that Xenon had fallen behind on payments for the sponsored research, and as a result the University had to turn to federal funds to fill the gap. Xenon denied that it owed the University any additional money. A year later, Xenon and the University settled this dispute and signed a Settlement and Release Agreement.

technology.[2] Attached to the Sponsor Option Agreement were the individual contracts between the Foundation and the University researchers.

At the same time that Xenon signed its first research agreement with the University, Xenon also entered into a series of short-term consulting agreements with individual researchers at the University who worked on SCD projects. In exchange for consulting fees, these scientists undertook specific research projects for Xenon and agreed to assign any discoveries arising from these consulting projects to Xenon.

In February 2001 Xenon and the Foundation filed a joint patent application deriving from the provisional patent application the Foundation had filed in 2000. The application covered, among other things, the SCD enzyme itself and a method (called an assay) of using the enzyme to identify compounds that lower SCD levels. A patent issued for the assay, but the patent application covering the remaining claims is still pending. Also in February 2001, Xenon exercised its option under the Sponsor Option Agreement to an exclusive license for any discoveries arising from the Xenon-sponsored SCD research at the University. As a result Xenon and the Foundation entered into an Exclusive License Agreement giving Xenon an exclusive right to make, use, and sell patented products under the joint patent application within the field of human healthcare. In exchange for

---

[2] The Sponsor Option Agreement was executed in February 2000 but backdated to September 1999.

these exclusive rights, Xenon agreed to pay the Foundation a percentage of any product sales, royalties, or sublicense fees it received.

After receiving the exclusive license, Xenon worked with Discovery Partners, Inc., to help identify compounds that inhibit the SCD enzyme. Using the jointly patented assay, Discovery Partners screened thousands of compounds and identified a set of 20 (referred to as the PPA compounds) with the potential to suppress SCD levels. Xenon shipped the PPA compounds to Mark Gray-Keller, a University researcher with whom it had a consulting agreement, for confirmatory testing. Gray-Keller successfully confirmed the inhibitory potential of the PPA compounds and thereafter assigned any interest he had in the compounds to Xenon. In 2002 Xenon filed a patent application covering the PPA compounds.

The Foundation objected, claiming that it had an ownership interest in the PPA compounds under the various interlocking agreements among the parties. More specifically, the Foundation noted that Gray-Keller had assigned all his rights in SCD discoveries and any improvements to the Foundation in his 2000 Memorandum Agreement. The Foundation also noted that the Sponsor Option Agreement between it and Xenon specifically acknowledged that Gray-Keller was required to assign his interest in any inventions arising from the jointly sponsored research to the Foundation. Alternatively, the Foundation claimed it had title to the compounds under the Bayh-Dole Act, 35 U.S.C. §§ 200 *et seq.,* because federal funds had been used in the research and development of the compounds.

Relations between Xenon and the Foundation continued to deteriorate in 2004 when Xenon signed a license agreement with Novartis Pharma AG ("Novartis"), a Swiss corporation. This agreement gave Novartis a license to the technology covered by the joint patent application and purported to transfer ownership of the PPA compounds. After learning of this agreement (via a press release), the Foundation demanded a percentage of the sublicense fees from Xenon under the terms of the Exclusive License Agreement. Xenon refused, claiming it had the right to license its undivided interest in the joint patent application without being subject to the terms of its license agreement with the Foundation.

The Foundation then brought this suit claiming that Xenon violated the terms of the Exclusive License Agreement and owed the Foundation a percentage of the sublicense fees it received from Novartis. The Foundation also claimed that it, not Xenon, owned Gray-Keller's interest in the PPA compounds. The Foundation sought damages and declaratory judgment. Xenon responded with counterclaims against the Foundation. The district court, on cross-motions for summary judgment, entered a series of rulings on all issues except damages. The judge held that Xenon breached the Exclusive License Agreement by granting a sublicense to Novartis without notifying the Foundation or conforming the sublicense to the terms set out in the license agreement. The judge also held that Xenon owed royalties or sublicense fees to the Foundation under the terms of the license agreement. The judge further held that in light of Xenon's breach, the Foundation had a right to terminate the license agreement.

The court also ruled in Xenon's favor on several issues. First, the judge dismissed as moot the Foundation's claim that Xenon breached its duty of good faith by failing to abide by the terms of the license agreement. Second, the judge held that the Foundation had not given Xenon proper notice or an opportunity to cure before invoking its right to terminate the license agreement. Third, the court denied the Foundation's claims to quiet title in the PPA compounds, for conversion of those same compounds, and for a declaratory judgment that Gray-Keller's purported assignment of his rights in the compounds to Xenon was void. The court held that the Foundation could not claim title to the compounds under either the Memorandum Agreement with Gray-Keller, the Sponsor Option Agreement with Xenon, or the Bayh-Dole Act. Later, the court vacated its ruling regarding the Foundation's right to terminate the license agreement; the judge agreed with Xenon that the Foundation had not properly developed this argument in its opening summary-judgment brief.

The case proceeded to a jury trial on the question of damages for Xenon's failure to pay royalties or sublicense fees. The jury awarded $1 million, but on Xenon's motion for remittitur the court reduced the award to $300,000, which the Foundation accepted. The parties cross-appealed from the judgment, challenging various of the district court's rulings on summary judgment; Xenon also challenges the sufficiency of the evidence on damages.

## II. Discussion

We review the district court's grant of summary judgment de novo. *Clancy v. Geithner*, 559 F.3d 595, 599 (7th Cir. 2009). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). On review of cross-motions for summary judgment, we view all facts and inferences in the light most favorable to the nonmoving party on each motion. *See Tate v. Long Term Disability Plan for Salaried Employees of Champion Int'l Corp. #506*, 545 F.3d 555, 559 (7th Cir. 2008). For organization and ease of discussion, we divide the issues on appeal into two groups: (1) those that relate to the rights of the parties under the Exclusive License Agreement, and (2) those that relate to the rights of the parties regarding the PPA compounds.

### A. Exclusive License Agreement

#### 1. *Xenon's Transfer of Rights to Novartis*

We begin by addressing Xenon's contention that it did not violate the terms of the Exclusive License Agreement when it licensed its interest in the joint patent application to Novartis without paying the Foundation its share of the licensing fee. As a threshold matter, Xenon argues that this dispute is resolved by federal patent law, not by contract law. The district court did not address the question whether Xenon retained a federal statutory right to freely license its interest without regard to the Foundation's contract rights. The court resolved the

parties' disputes based solely on the terms of their various contracts, holding that Xenon effectively executed a sublicense with Novartis and that this transaction fell within the provision of the Exclusive License Agreement governing sublicenses. Xenon contends that federal law—specifically, 35 U.S.C. § 262—gives it the right to freely license its undivided one-half interest in the joint patent application without accounting to the Foundation under the terms of the Exclusive License Agreement. We disagree.

Federal law provides that joint patent owners, like the Foundation and Xenon, have control over the entire property, and each co-owner may freely use the patented technology without regard to the other. *See* 35 U.S.C. § 262. We have previously observed that under this principle of patent law, "each co-owner is 'at the mercy' of the other in that the right of each to license independently 'may, for all practical purposes, destroy the monopoly and so amount to an appropriation of the whole value of the patent.'" *Rail-Trailer Co. v. ACF Indus., Inc.*, 358 F.2d 15, 17 (7th Cir. 1966) (quoting *Talbot v. Quaker-State Oil Ref. Co.*, 104 F.2d 967, 968 (3d Cir. 1939)). This statutory rule is subject to an important exception, however: Joint patent owners may vary their rights by contract. The statute provides that "*[i]n the absence of any agreement to the contrary*, each of the joint owners of a patent may make, use, offer to sell, or sell the patented invention . . . without the consent of and without accounting to the other owners." 35 U.S.C. § 262 (emphasis added). The statutory default rule therefore controls *unless* there is an agreement to the contrary.

Here, the Foundation and Xenon modified the statutory default rule by contract; the Exclusive License Agreement plainly qualifies as "an agreement to the contrary" for purposes of § 262. That agreement provides: "[The Foundation] hereby grants to Xenon an exclusive license, limited to the [field of human healthcare,] . . . under the Licensed Patents to make, use and sell Products." In exchange Xenon agreed to pay the Foundation a percentage of any payments, royalties, or sublicense fees it received by commercializing the technology itself or sublicensing the technology to a third party to commercialize. Under the terms of the agreement, sublicenses are expressly permitted—*provided* Xenon pays the Foundation the specified percentage of any royalties or sublicense fees—but *assignments* are prohibited without the Foundation's prior written consent.[3]

Xenon argues that nothing in the Exclusive License Agreement explicitly revokes its statutory right to license its interest freely. True, but the agreement's provision requiring that Xenon pay the Foundation a share of the fees derived from any sublicense plainly undermines Xenon's claim that it retained an unfettered right under § 262 to transfer its interest in the technology to third parties. So does the agreement's provision prohibiting assignment of the license without the Foundation's con-

---

[3] The Exclusive License Agreement states: "This Agreement is not assignable by either party except with the prior written consent of the other party, which consent shall not be unreasonably or arbitrarily withheld."

sent. The bargained-for exchange between the parties provided that the Foundation would forego its right to separately license the patent in exchange for receiving a share of the profits from Xenon's commercialization of the technology—either directly or via a sublicense to a third party. Xenon received a significant benefit from the agreement—the exclusive right to exploit the technology protected by the joint patent application. Xenon cannot avoid paying royalties or sublicense fees to the Foundation simply by labeling the Novartis transaction a "license" rather than a "sublicense."

Accordingly, the terms of the Exclusive Licensing Agreement, not 35 U.S.C. § 262, govern the parties' rights and responsibilities here. Under that agreement Xenon held an exclusive license to develop the SCD discovery for commercial purposes and a corresponding obligation to share proceeds with the Foundation. The agreement gives Xenon three options: (1) commercialize the technology directly and pay royalties to the Foundation; (2) sublicense the technology to a third party and pay a percentage of the sublicense fees to the Foundation; or (3) assign its exclusive licensing rights to a third party with the prior consent of the Foundation.

Xenon suggests in the alternative that it never actually gave Novartis a license to the Foundation's interest in the jointly patented technology. The district court properly rejected this argument. The Xenon-Novartis agreement provides that Xenon grants to Novartis an exclusive license to all Xenon technology in the field of human and animal healthcare. Xenon technology includes "Xe-

non's interest in all Patent Rights in the Field, as specifically described in Schedule B," and Schedule B prominently lists the joint patent application owned by Xenon and the Foundation—first out of four listed patents. Xenon argues unpersuasively that the phrase "patent rights" does not include rights it obtained through the Exclusive License Agreement. In the warranty clause of the Xenon-Novartis agreement, Xenon represents that "it is the owner *or licensee* of all rights, title and interest in and to the Xenon Patent Rights." (Emphasis added.) Accordingly, Xenon granted Novartis any interest it held in the joint patent application by specifically including it in Schedule B. Put another way, Xenon effectively sublicensed its exclusive license rights in the jointly patented technology. The district court correctly concluded that the Xenon-Novartis agreement is subject to the terms of the Exclusive License Agreement governing sublicenses.

### 2. *Sublicense Fees*

After concluding that Xenon granted Novartis a sublicense in the jointly patented technology, the district court held that Xenon violated the terms of the Exclusive License Agreement by failing to pay the Foundation a share of the sublicense fees. Xenon argues that it is not obligated to make payments to the Foundation until products are actually brought to market and sold as a result of the sublicense. Because no products have yet been sold, Xenon claims it does not owe the Foundation anything. Again, we disagree. The Exclusive License

Agreement requires Xenon to pay the Foundation license fees, milestones, and royalty payments as soon as they are received.[4]

Section 4 of the Exclusive License Agreement, titled "Consideration," lays out the payment details and schedule. Subsection (B)(i) of that section states: "For all Products *sold directly by Xenon*, Xenon shall pay to [the Foundation] . . . a royalty calculated as a percentage of the Selling Price of Products . . . ." (Emphasis added.) It goes on to specify that royalties are earned on either the date the product is actually sold, the date an invoice is sent, or the date the product is transferred to a third party for promotional reasons—whichever comes first. The next subsection—the provision most relevant to this dispute—states:

> For all Products sold by Xenon sublicensees, Xenon shall pay to [the Foundation] a percentage of any license fees, milestones, and royalty payments received by Xenon as consideration for the sublicense granted to such sublicensees under Section 2B. The percentage shall remain fixed at a rate of ten percent (10%) for years one (1) and two (2) of this Agreement and seven and one-half percent (7.5%) thereafter until this Agreement is terminated.

Because both subsections begin with the phrase "[f]or all Products *sold*" (emphasis added), Xenon argues that it

---

[4] Technically, the contract stipulates that Xenon must pay the Foundation on a quarterly basis, as specified in Section 4(E)(i) of the Exclusive License Agreement.

does not owe the Foundation any payments for the Novartis sublicense until products are actually brought to market and sold.

We agree with the district court that Section 4, read as a whole, requires payment of the Foundation's share of the sublicense fee independent of any actual sales of products. The apparent point of the prefatory phrase "[f]or all Products sold" in each of the two subsections governing payment is to distinguish between payments required when Xenon commercialized the technology itself and payments required when Xenon issued a sublicense to a third party to do so. In the former circumstance, the payment due the Foundation is a royalty based on products sold; in the latter circumstance, the payment due the Foundation is a specified percentage of the sublicense fee Xenon receives, plus "milestones" and royalties. Because the Novartis transaction falls under the second subsection, payment is due on receipt of a sublicense fee, not on the occurrence of product sales.

This reading of the payment provision is the most plausible for several reasons. Although both subsections use the same introductory phrase, the first subsection also says that payment is due upon actual product sale while the second subsection—governing sublicenses—does not include similar language. Instead, the second subsection states that Xenon owes the Foundation a percentage of any license fees and "milestones," in addition to royalty payments, stemming from any sublicense. As the district court noted, sublicense fees and milestone payments are not contingent upon a sale; they

are paid immediately or on an ongoing basis by a licensee or sublicensee in exchange for the right to make sales of products developed in the future. Finally, the parties agree that it generally takes about 15 years to bring a drug product to market. Yet the Exclusive License Agreement specifies that Xenon must pay the Foundation 10% of any license fees, milestones, and royalty payments received during the first two years of the agreement and 7.5% thereafter. This provision would make little sense if no payment was required on a sublicense until a product was brought to market. Accordingly, the district court properly concluded that Xenon breached the Exclusive Licensing Agreement by failing to pay the Foundation its share of the fee from the Novartis transaction.[5]

### 3. *Damages*

The district court entered summary judgment on liability; damages were tried to a jury. Xenon's agreement

---

[5] After concluding that Xenon breached the Exclusive License Agreement, the district court dismissed the Foundation's claim for breach of the implied duty of good faith as moot. The Foundation claims this was error. It was not. Under Wisconsin law a duty of good faith is implied in every contract. *See Market Street Assocs. Ltd. P'ship v. Frey*, 941 F.2d 588, 592 (7th Cir. 1991) (applying Wisconsin law). But because Xenon is liable for breach of the license agreement's express terms, there is no reason to resort to—or separate factual basis to support—a claim for breach of the implied duty of good faith.

with Novartis purported to grant a license to: (1) the joint patent agreement; (2) the PPA compounds; (3) several other patent applications; and (4) Xenon's "know-how." Novartis paid Xenon $4 million in cash and another $11 million in stock as part of a separate Stock Purchase Agreement signed the same day. The question for the jury was how much of this fee was payment for the joint-patent-agreement sublicense and the PPA compounds as opposed to the other pieces of the package.[6] As we have noted, the Exclusive License Agreement stipulated that the Foundation should receive 7.5% of "any license fees, milestones, and royalty payments received by Xenon as consideration *for the sublicense*." (Emphasis added.) In a special verdict, the jury awarded nothing for the sale of the PPA compounds and $1 million for the sublicense—just under 7.5% of the $15 million in cash and equity Xenon received from Novartis.

Xenon moved posttrial for remittitur, which the district court granted. The judge held that "the jury had sufficient evidence to award plaintiff 7.5% of the full

---

[6] While the district court concluded that Xenon owned the PPA compounds, it also held that the PPA compounds fell under the terms of the Exclusive License Agreement and that Xenon owed the Foundation fees for these compounds as well. We need not address the apparent incongruity in these conclusions; the jury made no award for the portion of the sublicense fee that included the PPA compounds. Moreover, as we explain, *infra* pp. 24-28, we are reversing the district court's determination that the Foundation had no ownership interest in the compounds.

$4,000,000 that Novartis paid in cash for defendant's intellectual property." But the judge concluded there was insufficient evidence to support inclusion of a percentage of the $11 million in stock, which the evidence suggested was part of a separately negotiated agreement. The district court offered the Foundation a remittitur of $300,000—7.5% of the $4 million cash fee—which the Foundation accepted.

On appeal Xenon argues that the Foundation did not provide sufficient evidence of damages to justify even a $300,000 damages award. We review sufficiency-of-the-evidence challenges de novo, viewing the evidence in the light most favorable to the prevailing party and drawing all inferences in its favor. *Lopez v. City of Chicago*, 464 F.3d 711, 718 (7th Cir. 2006). Under Wisconsin law a plaintiff must present enough evidence to provide a reasonable basis for calculating damages; the evidence will be sufficient if it enables the jury to make a fair and reasonable approximation of damages. *See Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1372 (7th Cir. 1990); *Brogan v. Indus. Cas. Ins. Co.*, 392 N.W.2d 439, 444 (Wis. Ct. App. 1986).

Under this lenient standard, the evidence is easily sufficient to sustain the damages award. The Foundation argued to the jury that the joint patent application was the only item in the Xenon-Novartis package with any real value, and thus the price Novartis paid reflected its fair market value. The Foundation relied on a sales-pitch letter Xenon sent to Novartis offering to sell the technology covered by the joint patent application; the

letter made no mention of the PPA compounds or any other patented technology. The Foundation also noted that the joint patent application is listed first in the Novartis agreement, arguably demonstrating priority over the other listed patent applications. Moreover, the Foundation noted that Xenon transferred only about 100 grams of the PPA compounds to Novartis—"left over" material that was so insignificant that Xenon did not price it or invoice it. Finally, the Foundation suggested that Xenon's "know-how" was valueless because the phrase was defined in such a way as to include nothing beyond what was already covered under "Xenon Patent Rights." Viewed in the light most favorable to the Foundation, this evidence was sufficient to sustain the damages award.

Xenon complains that the Foundation did not adequately establish the precise market value of the sublicense for the joint patent application as compared to the other parts of the package. But Wisconsin law provides that a contracting party that causes an uncertainty of proof cannot demand a more precise measure of damages. *See Novo Indus. Corp. v. Nissen*, 140 N.W.2d 280, 285 (Wis. 1966). Xenon had a duty under the Exclusive Licensing Agreement to make an accounting to the Foundation on a quarterly basis, to disclose any payments received, and to explain how any amounts owed to the Foundation had been calculated. It did not do so. Under these circumstances the Foundation was not required to establish a more specific measure of damages.

Xenon also argues that proving damages in this case required the use of expert testimony, citing a number of

Wisconsin cases holding that expert testimony is required in complex or technical cases where the issue is outside the common knowledge of a jury. *See, e.g.*, *Weiss v. United Fire & Cas. Co.*, 541 N.W.2d 753, 757 (Wis. 1995) ("The court has long recognized that certain kinds of evidence are difficult for jurors to evaluate without the benefit of expert testimony."). Here, although the interlocking contracts were obviously technical and complex, the issue of damages was not beyond a lay juror's understanding. The Foundation was entitled to prove the value of the sublicense essentially by a process of elimination—by showing that the other items in the Xenon-Novartis transaction had little or no value. This method of proving damages dispensed with any need for expert testimony regarding the market value of the joint patent application.

### 4. *The Foundation's Right to Terminate the Exclusive License Agreement*

In addition to damages, the Foundation also asked for a declaration that it had a right to terminate the Exclusive License Agreement based on Xenon's breach. The district court granted summary judgment for the Foundation on this claim, and on May 17, 2006, the Foundation sent Xenon a letter terminating the Exclusive License Agreement. Xenon responded with two motions, one for reconsideration of the district court's decision and the other for a stay of execution of the judgment pending disposition of Xenon's motion for reconsideration. The district court granted Xenon's motion

to stay enforcement of the judgment, holding that the Foundation's purported termination of the Exclusive License Agreement was void because the Foundation had not given Xenon notice and 90 days to cure its breach, as the agreement required. The court further held that once the Foundation filed this lawsuit, its right to terminate the license agreement depended on a finding of breach by the court. The judge concluded as follows: "[A]ny attempted termination of the agreement that has already occurred is suspended until the court has ruled on the post-trial motions and plaintiff may not take renewed action to terminate the agreement until that time." A month later, the district court granted Xenon's motion for reconsideration, agreeing that the Foundation had not properly moved for summary judgment on this claim. However, the judge also said that if the Foundation wanted to terminate the Exclusive License Agreement, it could now do so—because Xenon had been found in breach—but that the Foundation was first required under the terms of the agreement to give Xenon notice and 90 days to cure.

On appeal the Foundation challenges the district court's conclusion that its right to terminate the agreement did not arise until the court found Xenon in breach of the agreement. The Foundation maintains that its right to terminate was triggered by Xenon's breach and was not contingent upon the court's *finding* of breach. The Foundation also argues that it properly terminated the agreement. We agree on both counts.

Section 7 of the Exclusive License Agreement governs the Foundation's right to terminate:

> If Xenon at any time defaults in the timely payment of any monies due . . . or commits any breach of any other covenant herein contained, and Xenon fails to remedy any such breach or default within ninety (90) days after written notice thereof by [the Foundation,] . . . [the Foundation] may, at its option, terminate this Agreement by giving notice of termination to Xenon.

In March 2005 the Foundation sent Xenon written notice that it considered the Xenon-Novartis transaction to be a sublicense of the joint patent application and that Xenon owed the Foundation sublicense fees. The relevant portion of the letter states:

> Our analysis has led us to conclude that the Novartis agreement is, in fact, a sub-license of rights granted by [the Foundation] to Xenon and we also require that Xenon remit . . . payment of any amounts owed to [the Foundation] under the Agreement. In the event that Xenon contends that no amounts are owed to [the Foundation] or that the Novartis agreement is not a sublicense as contemplated by the Agreement, Xenon must immediately provide . . . a detailed written explanation as to why such amounts are not owed or why the Novartis agreement is not a sublicense . . . .

This letter plainly gave Xenon notice that the Foundation considered it to be in breach of its payment obligations under the Exclusive License Agreement. Notably, Xenon does not disagree. Instead, Xenon argues that the Foundation did not provide 90 days to cure the breach because the Foundation filed suit a month after sending Xenon

this letter. The March 2005 notice, Xenon says, was therefore ineffective under the termination provision of the Exclusive License Agreement.

We disagree. A contractual obligation to provide notice and an opportunity to cure a default prior to terminating a contract does not necessarily affect the aggrieved party's right to sue for breach. *See Ameritech Info. Sys., Inc. v. Bar Code Res., Inc.*, 331 F.3d 571, 573-74 (7th Cir. 2003). Here, nothing in the Exclusive License Agreement prevented the Foundation from suing for breach within the 90-day cure period, *id.* at 574, nor was the Foundation's right to terminate somehow suspended by the filing of this lawsuit. Having filed the suit, the Foundation's right to terminate did not become contingent upon the court finding Xenon in breach. A contracting party's right to terminate arises under the terms of the contract and need not await a formal declaration of the contracting parties' rights.

Here, the district court issued a stay of the execution of its summary-judgment ruling pending disposition of Xenon's posttrial motions. A stay, unlike an injunction, operates only on the judicial proceeding itself and does not otherwise prohibit the parties from acting. *See Nken v. Holder*, 129 S. Ct. 1749, 1757-58 (2009) ("An injunction and a stay have typically been understood to serve different purposes. The former is a means by which a court tells someone what to do or what not to do. . . . By contrast, instead of directing the conduct of a particular actor, a stay operates upon the judicial proceeding itself."). Some of the court's language in the stay order is suggestive of

an injunction: "[A]ny attempted termination of the agreement that has already occurred is suspended until the court has ruled on the post-trial motions and plaintiff may not take renewed action to terminate the agreement until that time." But if this was meant to be an injunction, it was an improper one. As a procedural matter, injunctions must comply with the requirements of Rule 65(d) of the Federal Rules of Civil Procedure; a court issuing an injunction must, among other things, give advance notice to the adverse party, hold a hearing on the matter, explain why the injury that would occur without the injunction is irreparable, and specify the scope of the injunction in reasonable detail. The district court's stay order did not comply with these requirements.

Accordingly, the district court erroneously concluded that the Foundation's right to terminate the agreement was contingent upon the court's finding that Xenon had breached the Exclusive License Agreement. The Foundation was entitled to terminate the agreement based on Xenon's breach, and it properly did so under the agreement's termination provision. The Foundation's March 2005 letter was sufficient to give notice to Xenon that the Foundation considered it in breach. More than 90 days elapsed between the time of this notice and the Foundation's letter—on May 17, 2006—terminating the license agreement. Nothing more was required.

## B.  PPA Compounds

We move now to the second set of issues on appeal concerning the ownership rights to the PPA compounds.

The Foundation brought several claims pertaining to its interests in the PPA compounds: It sued for a declaratory judgment that Gray-Keller's assignment to Xenon of his interest in the compounds was void; it sought to quiet title in the PPA compounds; and it sued for conversion of its property rights. The parties filed cross-motions for summary judgment on each of these claims, and the district court entered judgment for Xenon on all three claims. On appeal the Foundation reasserts its entitlement to an ownership interest in the PPA compounds.

A brief recap of the relevant facts is in order: Xenon, with the help of Discovery Partners, used the jointly patented assay to screen thousands of compounds for therapeutic potential. Xenon and Discovery Partners identified a set of 20 "PPA compounds" with the potential to lower SCD levels in the human body, and Xenon sent these compounds to Gray-Keller for confirmatory screening. Gray-Keller confirmed the cholesterol-inhibiting potential of the PPA compounds and in July 2003 purported to assign his rights to Xenon pursuant to the terms of his consulting agreement.

The Foundation contends that the interlocking network of contracts among the parties gives it ownership of Gray-Keller's interest in the PPA compounds, and therefore Gray-Keller's assignment is void.[7] We agree. Under the

---

[7] Xenon argues that the Foundation is barred from bringing a claim for ownership of the PPA compounds by the Settlement and Release Agreement signed by Xenon and the Univer-

(continued...)

Sponsor Option Agreement, all University researchers working on the Xenon-funded research program agreed to assign to the Foundation their rights to any inventions that they "conceived of or reduced to practice . . . whether solely or jointly with others." Each University researcher, including Gray-Keller, signed an individual Memorandum Agreement to that effect, and copies were attached to and incorporated as part of the Sponsor Option Agreement. The scope of the joint research program was defined by three separate research agreements—Research Agreements 1, 2, and 3.

The Foundation maintains that Gray-Keller's work on the PPA compounds fell within the scope of Research Agreement 2, and therefore Gray-Keller was required to assign his interest in the compounds to the Foundation. Research Agreement 2 generally covers research to identify compounds that will influence SCD levels in the human body for therapeutic effect on cholesterol levels. While the scientific language and acronyms keep the contract from being readily understandable to a layperson, the scope of the research program is clear enough. First, Exhibit A to Research Agreement 2 is titled "Stearoyl CoA Desaturase (SCD) as a Target for

---

[7] (...continued)

sity in 2003. We need not spend much time on this argument. As we have explained, *supra* n.1, the 2003 settlement pertained to a funding dispute between the University and Xenon; it had nothing to do with who owns the intellectual-property rights to the discoveries resulting from the jointly sponsored research.

Elevation of HDL." It states that its overall goal is to "evaluate SCD as a target for the development of drugs that would increase the levels of HDL in plasma and decrease triglycerides (which should have a therapeutic impact on cardiovascular disease)." It then lists a handful of more specific goals, such as to "[s]creen and rank order substrates/inhibitors of SCD1 activity for impact on SCD1 transcription in vitro" and to "[e]valuate lead sub-strates/inhibitors from in vitro screen for their effect on SCD1 transcription, SCD1 enzyme activity and HDL metabolism in vivo."

Gray-Keller's work identifying and confirming the therapeutic potential of the PPA compounds derived from the SCD enzyme was expressly contemplated by Research Agreement 2, which broadly covered research "to validate SCD as a target for screening novel com-pounds that may elevate HDL levels in vivo." Gray-Keller performed his research on this project at the University using University resources and was required under his Memorandum Agreement to assign his interest in any discoveries to the Foundation. The fact that his work was conducted partly under Xenon's sponsorship and at its behest is not dispositive. Under the Sponsor Option Agreement and each of the individual agreements attached to it, the Foundation was entitled to ownership of any discoveries "conceived of or reduced to practice" by the researchers under the joint research program; Xenon was entitled to an exclusive license to com-mercialize the discoveries. Accordingly, the district court erred in granting summary judgment to Xenon on the claims pertaining to the Foundation's ownership interest

in the PPA compounds. Under the Sponsor Option Agreement, the Memorandum Agreement, and Research Agreement 2, the Foundation was entitled to a declaration of its ownership interest in the PPA compounds.[8]

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment for the Foundation on its claim that Xenon breached the Exclusive License Agreement, as well as the district court's order entering judgment on the remittitur in the amount of $300,000. We REVERSE the district court's reconsideration order regarding the Foundation's right to terminate the Exclusive License Agreement; under the terms of the agreement's termination provision, the Foundation was entitled to and properly terminated the agreement. Finally, we REVERSE the judgment in favor of Xenon on the Foundation's claims to quiet title and for declaratory judgment that Gray-Keller's purported assignment of his interest in the PPA compounds to Xenon is void. On these claims, we REMAND with instructions to enter judgment in favor of the Foundation.

---

[8] Our holding in this regard makes it unnecessary to consider the Foundation's alternative argument that it had a right to an ownership interest in the PPA compounds under the Bayh-Dole Act.