In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3604

DICK V. LALOWSKI,

*Plaintiff-Appellant,*

*v.*

CITY OF DES PLAINES, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:08-cv-03780 — **James B. Zagel**, *Judge.*

ARGUED SEPTEMBER 10, 2013 — DECIDED JUNE 17, 2015

Before KANNE, WILLIAMS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Dick Lalowski was formerly a police officer for the City of Des Plaines, Illinois. However, on the morning of May 20, 2006, he had two altercations with a group of demonstrators at an abortion clinic, one while he was on duty and the other shortly after his shift ended. Lalowski's conduct during these altercations led the City's police chief at the time, James Prandini, to file charges against him with the Des Plaines Board of Fire and Police

Commissioners and to recommend his discharge. The Board held two sets of administrative hearings, one on the merits of the charges against Lalowski and the other on the appropriate penalty. After the first set of hearings, the Board voted unanimously to sustain the charges, and after the second set of hearings, it voted unanimously to terminate Lalowski's employment. The Board issued a written decision on May 30, 2008.

On July 2, 2008, Lalowski filed this action against Prandini, the Board, and the City. He brought five claims, but only two are at issue in this appeal: (1) a claim against all three defendants under 42 U.S.C. § 1983, alleging that they retaliated against him for his protected speech in violation of the First Amendment; and (2) a claim against the Board under Illinois's Administrative Review Law, 735 I.L.C.S. §§ 5/3-101 *et seq.*, seeking review of the Board's decision to terminate his employment. The district court granted summary judgment against Lalowski on both claims, and he appeals that ruling.

## I.   SPEECH RETALIATION CLAIM

The parties filed cross-motions for summary judgment on Lalowski's speech retaliation claim under the First Amendment. "On review of cross-motions for summary judgment, we view all facts and inferences in the light most favorable to the nonmoving party on each motion." *Wis. Alumni Research Found. v. Xenon Pharm., Inc.*, 591 F.3d 876, 882 (7th Cir. 2010). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Below, we recite the facts relevant to Lalowski's speech retaliation claim that were before the district court on

summary judgment. These facts are undisputed unless otherwise noted.

## A.  SUMMARY JUDGMENT RECORD

During the early morning hours of May 20, 2006, a group of demonstrators gathered outside an abortion clinic in Des Plaines, Illinois. The demonstrators hoped to dissuade women from entering the clinic, and as part of that effort, they planned to display large signs containing images of aborted fetuses. Meanwhile, then-Officer Lalowski was nearing the end of an overnight shift. Around 6:30 a.m., he noticed the demonstrators setting up, and he pulled his marked police vehicle up to them and began speaking to a woman named Paula Emmerth. Lalowski told Emmerth not to impede traffic or to stop anyone from entering the clinic. He also told the demonstrators that he would arrest them if they did not comply.

At this point, the stories diverge. Emmerth claims Lalowski called her a "fat fucking cow." She and other demonstrators also claim that Lalowski used repeated profanities and threats (e.g., "I'll fucking arrest you"), accused the demonstrators of acting like the Taliban, and generally behaved in a way that was intimidating and "out of control." Lalowski, on the other hand, concedes that this initial confrontation with the demonstrators was "adversarial" but denies using profanity or accusing them of acting like the Taliban. In any event, this first exchange lasted only a few minutes. Upon request, Lalowski provided the demonstrators with his name and badge number, then he left the clinic and returned to the Des Plaines police station.

Back in the station locker room, Lalowski began to think about the images of aborted fetuses the demonstrators were displaying, and he became upset. He testified in his deposition, "At that time I was thinking about why would somebody put those signs out there, why would anybody who was trying to help people do that [?] I had to know." Thus, he decided that he would go back to the clinic to confront the demonstrators about their signs.

Around 7:00 a.m., Lalowski, now off duty and wearing plain clothes, returned to the abortion clinic in his personal vehicle. He parked his car in an adjacent lot and walked over to Matthew Jones, a fellow Des Plaines police officer who was stationed at the clinic to provide security and ensure that the demonstration remained orderly. After a brief conversation with Jones, Lalowski approached Paula Emmerth, greeted her, and asked if she remembered him. Emmerth said that she remembered him as the police officer who had spoken to her earlier that morning. Lalowski told her that he was now off duty and "not [t]here representing anybody." However, he concedes that he wanted the demonstrators to know that he was a police officer so they would show him respect, even though he was off duty.

Lalowski then asked Emmerth why the demonstrators were displaying the aborted-fetus signs. Emmerth said that they were using the signs to tell the truth about abortion, to which Lalowski responded, "Okay. Let's talk about the truth then. You're fat." Lalowski then started telling Emmerth and other demonstrators that they should not show the fetus signs because "the truth sometimes hurts." He noted that a woman who had recently had a miscarriage might drive by and be upset by the signs. When Emmerth refused to take

down the signs, Lalowski called her a "fat fucking cow" and a "sinner of gluttony," then he sarcastically asked her whether she was hiding food somewhere. Lalowski claims to have made these statements to provide Emmerth with a few stinging examples of how the truth can hurt. He then began to lecture Emmerth on the importance of exercise and got down on all fours to demonstrate aerobic exercises she could do to lose weight.

After demonstrating the exercises, Lalowski got up and continued talking to Emmerth. At some point, he reached out and made physical contact with her. There is a factual dispute as to the manner of the touching. Lalowski says that he patted Emmerth on the shoulder to "convey sincerity," but Emmerth says that he "poked" her in both arms and rubbed her arms "in a creepy, sexual way."

This time, Lalowski remained at the clinic for approximately one hour and twenty minutes. During the course of that time he spoke with many demonstrators, and there are factual disputes over his specific language, tone of voice, and general demeanor during these conversations. However, it is undisputed that Lalowski accused the demonstrators of using intimidation tactics like the Taliban, compared their use of the aborted-fetus signs to using an image of a priest "bending over" a small boy to protest sexual abuse within the Catholic church, called demonstrator Wanda Glitz a "psycho" and a "man hater," called Paula Emmerth a "fat cow" several times, called Paula's sister Teresa Emmerth "fatty," and told Paula Emmerth that she would be a beautiful woman if she were not so fat. At some point, Officer Jones called Lalowski over to notify him that a demonstrator had called 911 to request police assistance in dealing with

him. Finally, after Lalowski realized that his efforts to persuade the demonstrators to take down their signs were futile, he hugged Paula Emmerth, told her that he loved her, and went on his way. He made no report of his on-duty or off-duty contact with the demonstrators.

Later that day, then-police chief Prandini received a call at home from one of his sergeants about the morning's incidents. Prandini asked two officers, Sergeant Kevin O'Connell and Deputy Chief Terry McAllister, to investigate Lalowski's conduct at the clinic. During the course of the investigation, Lalowski and several demonstrators were interviewed and gave written statements. On May 24, 2006, Sergeant O'Connell and Deputy Chief McAllister sent Prandini a final report of their investigation. The report stated in part, "Officer Lalowski's conduct [on the morning of May 20th] toward the public was harsh, profane, and unruly and caused a huge disturbance among numerous citizens of the city of Des Plaines. He used insulting, profane language toward numerous female citizens and caused a hostile feeling towards the city of Des Plaines and the Des Plaines Police Department."

Based on this report, Prandini decided to suspend Lalowski without pay and file charges with the Board of Fire and Police Commissioners seeking his termination. Prandini filed five charges against Lalowski for violations of the police department's rules and regulations governing unbecoming conduct, courteous and orderly dealings with the public, the obligation to obey all laws and department rules and regulations, truthfulness, and impartiality. Two additional charges were brought against him based on violations of Illinois Criminal Code Sections 5/12-1 and 5/12-3, which deal

with assault and battery. After a series of administrative hearings, the Board unanimously voted to sustain all charges against Lalowski and to order his discharge from the Des Plaines Police Department.

In reaching its decision, the Board credited the demonstrators' version of the events and found that Lalowski had been untruthful to the extent that his story contradicted theirs. The Board also relied upon Lalowski's disciplinary history as an aggravating factor in its decision to terminate his employment. That history included five suspensions and two written reprimands. Moreover, two of those disciplinary actions resulted from Lalowski's interactions with the public. Specifically, in 1996, he was suspended for ten days after getting into an argument with a woman while he was on duty, calling her a "slut" and a "whore," and pushing her to the ground. Then, in 2002, he received a written reprimand for using profane language toward a private citizen.

## B. RES JUDICATA

As an initial matter, Prandini and the City argue that if we were to affirm the district court's entry of summary judgment in favor of the Board on Lalowski's administrative review claim, his First Amendment claim would be barred by the doctrine of res judicata. We disagree. The doctrine of claim preclusion, or res judicata, operates to bar a "second suit" after a final judgment involving the same parties and causes of action. *Bernstein v. Bankert*, 733 F.3d 190, 226 (7th Cir. 2013) (quoting *Kratville v. Runyon*, 90 F.3d 195, 197 (7th Cir. 1996)). However, it cannot be invoked to bar claims brought in the same suit. *See Lee v. City of Peoria*, 685 F.2d 196, 199 (7th Cir. 1982) ("The essential elements of the doctrine are generally stated to be: (1) a final judgment on the

merits in an earlier action; (2) an identity of the cause of action in both the earlier and the later suit; and (3) an identity of parties or their privies in the two suits."); *cf. United States v. Sherman*, 912 F.2d 907, 909 (7th Cir. 1990) (holding that the related doctrine of issue preclusion, or collateral estoppel, "requires separate actions"). Lalowski's administrative review claim and his First Amendment claim were both brought in this action. As a result, a final judgment on one would not preclude the other.

Prandini and the City cite several cases in which we gave preclusive effect to a state court's judgment upholding an agency decision. *See Dookeran v. Cnty. of Cook, Ill.*, 719 F.3d 570, 577–78 (7th Cir. 2013); *Abner v. Ill. Dep't of Transp.*, 674 F.3d 716, 721–22 (7th Cir. 2012); *Hayes v. City of Chicago*, 670 F.3d 810, 815–16 (7th Cir. 2012); *Garcia v. Vill. of Mount Prospect*, 360 F.3d 630, 644 (7th Cir. 2004); *Licari v. City of Chicago*, 298 F.3d 664, 666–67 (7th Cir. 2002); *Pirela v. Vill. of N. Aurora*, 935 F.2d 909, 915 (7th Cir. 1991). But all of those decisions followed a final judgment in a separate state action. Prandini and the City have failed to cite any authority for the proposition that res judicata may be applied to preclude a claim brought in the same action. Therefore, we turn to the merits of Lalowski's First Amendment claim.

### C. MERITS

"It is well-established in our jurisprudence that a public employee does not shed his First Amendment rights at the steps of the government building." *Vargas-Harrison v. Racine Unified Sch. Dist.*, 272 F.3d 964, 970 (7th Cir. 2001). However, "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the

citizenry in general." *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 358 (7th Cir. 2005) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)) (internal quotation marks omitted). Thus, a unique constitutional framework applies:

> When a plaintiff brings a § 1983 claim for retaliation in violation of First Amendment rights in the employment context, our analysis involves three steps. First, the court must determine whether the employee's speech was constitutionally protected under the *Connick-Pickering* test. Second, the plaintiff must establish that the speech was a substantial or motivating factor in the alleged retaliatory action. Finally, if the plaintiff satisfies the first two steps, the defendant has an opportunity to establish that the same action would have been taken in the absence of the employee's protected speech.

*Hutchins v. Clarke*, 661 F.3d 947, 955 (7th Cir. 2011) (internal citations omitted). In this case, the district court concluded that Lalowski could not prevail on his speech retaliation claim because only some of his statements were constitutionally protected, and none of those statements was a motivating factor in his termination. We agree that Lalowski cannot prevail, but we will not reach the causation issue, because we conclude that none of his statements was constitutionally protected under the *Connick-Pickering* test.

The *Connick-Pickering* test, derived from *Connick v. Myers*, 461 U.S. 138 (1983), and *Pickering*, 391 U.S. 563, is a two-part test used to determine whether a public employee's speech

is constitutionally protected. *See Phelan v. Cook Cnty.*, 463 F.3d 773, 790–91 (7th Cir. 2006). "First, the speech is protected only if it addressed a matter of public concern." *Carreon v. Ill. Dep't of Human Servs.*, 395 F.3d 786, 791 (7th Cir. 2005). "If it did, the court must then apply the *Pickering* balancing test to determine whether 'the interests of the [plaintiff] as a citizen in commenting upon the matters of public concern' are outweighed by 'the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Coady v. Steil*, 187 F.3d 727, 731 (7th Cir. 1999) (alteration in original) (quoting *Pickering*, 391 U.S. at 568).

The district court placed Lalowski's speech into three categories. First, the court found that some of Lalowski's statements did not address a matter of public concern and were therefore unprotected. Second, the court found that some of Lalowski's statements touched only loosely upon matters of public concern, and because the state had a "strong overriding interest" in proscribing them, those statements were also unprotected. Finally, the court found that some of Lalowski's statements touched more directly upon matters of public concern, and because the state lacked a "legitimate overriding interest" in proscribing them, those statements were protected.

We agree that at least some of Lalowski's speech touched upon matters of public concern. While Lalowski spent much of his time hurling profanity and insults at the demonstrators, he also managed to express his disapproval of their methods, i.e., their use of the aborted-fetus signs. However, in light of the context in which those statements were made, we think the district court was wrong to conclude that the

state had no "legitimate overriding interest" in proscribing them.

The *Pickering* balancing test contemplates a fact-intensive inquiry into a number of interrelated factors:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place, and manner of the speech; (5) the context within which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public.

*Gustafson v. Jones*, 290 F.3d 895, 909 (7th Cir. 2002). In this case, nearly all of the factors weigh heavily against Lalowski.

First, his speech had the potential to create problems in maintaining discipline and harmony in the Des Plaines Police Department. Importantly, a showing of actual disruptiveness is not required; "a government employer is allowed to consider 'the potential disruptiveness' of the employee's speech." *Kokkinis v. Ivkovich*, 185 F.3d 840, 846 (7th Cir. 1999) (quoting *Caruso v. De Luca*, 81 F.3d 666, 670–71 (7th Cir. 1996)). The employer "is not required to wait until those working relationships actually disintegrate if immediate action might prevent such disintegration." *Breuer v. Hart*, 909 F.2d 1035, 1040 (7th Cir. 1990).

Protests at the abortion clinic were nothing new, and the Des Plaines Police Department was charged with keeping the peace during such protests. In fact, a Des Plaines police officer was stationed at the clinic during Lalowski's rant on the day in question. By causing such a large disturbance, Lalowski positioned himself in opposition to the goals of his employer, thus compromising the harmony of the department for which he worked. Indeed, the officer stationed at the clinic was forced to confront Lalowski after one of the demonstrators called 911. Even if this incident did not actually cause disharmony among Des Plaines police officers, the potential for disruption is readily apparent. The department could not reasonably be expected to police protests of any sort, let alone the recurring protests at this abortion clinic, if it condoned such behavior.

The potential for disruption is exacerbated by the second factor, i.e., the importance of personal loyalty and confidence in the employment relationship. We have recognized that "there is a particularly urgent need for close teamwork among those involved in the 'high stakes' field of law enforcement." *Breuer*, 909 F.2d at 1041. "Speech that might not interfere with work in an environment less dependent on order, discipline, and *esprit de corps* could be debilitating to a police force." *Id.* Thus, "[d]eference to the employer's judgment regarding the disruptive nature of an employee's speech is especially important in the context of law enforcement." *Kokkinis*, 185 F.3d at 846.

Turning to the third factor, Lalowski's speech directly conflicted with his responsibilities as a police officer because one of those responsibilities was to foster a relationship of trust and respect with the public. "Police officers ... are quin-

tessentially public servants. As such, part of their job is to safeguard the public's opinion of them, particularly with regard to a community's view of the respect that police officers … accord the members of that community." *Locurto v. Giuliani*, 447 F.3d 159, 178–79 (2d Cir. 2006). "The effectiveness of a city's police department depends importantly on the respect and trust of the community and on the perception in the community that it enforces the law fairly, even-handedly, and without bias." *Id.* at 178 (quoting *Pappas v. Giuliani*, 290 F.3d 143, 146–47 (2d Cir. 2002). By attacking private citizens with profane and disrespectful language, Lalowski compromised the community's trust in its police officers, thus failing in one of his most important duties.

Fourth, we must consider the time, place, and manner of Lalowski's speech. Because he confronted the protestors at the time and place they chose to protest, the time and place of his speech were reasonable. However, the manner in which he spoke cannot be justified. Lalowski aggressively lambasted, ridiculed, and touched the protestors, going far beyond what was necessary to communicate his displeasure with their methods. His words and deeds were abusive and degrading, falling well below the standard of conduct the public expects from police officers, even while off duty.

The fifth factor to be considered is the context in which the underlying dispute arose. Lalowski's termination occurred against the backdrop of his disciplinary history, which included five suspensions and two written reprimands. One of his suspensions resulted from an argument with a woman he called a "slut" and a "whore" and pushed to the ground. One of his written reprimands was for using profane language toward a private citizen. In light of

Lalowski's history of problematic interactions with the public, Prandini and the Board had a substantial interest in preventing further hostility. *See Kokkinis*, 185 F.3d at 846 ("The increasing distrust and hostility between [a police officer] and the Chief must inform our evaluation of the Chief's response to [the officer's] speech.").

The sixth factor—whether the matter was one on which debate was vital to informed decision-making—is the only factor that weighs in favor of Lalowski's speech interests. We do not doubt that any organized protest could benefit from informed debate regarding its methods.

Finally, although Lalowski was off duty when he engaged in the speech at issue, he cannot be regarded as a member of the general public. He first confronted the demonstrators while on duty, in an encounter even he characterizes as "adversarial." He then left the clinic, only to return off duty about a half hour later. Although his shift had ended, this second encounter was a mere continuation and escalation of the earlier, on-duty confrontation. Indeed, when Lalowski returned, he made sure the demonstrators remembered him as a police officer. Although he also told them that he was "not [t]here representing anybody," he concedes that he wanted them to know he was a police officer so they would show him respect. Because Lalowski represented himself as an off-duty police officer, rather than as a mere private citizen, we cannot say that he was speaking as a member of the general public. *Cf. Coady*, 187 F.3d at 733 (finding that an off-duty firefighter who displayed a political sign on his car was not "speaking as a firefighter" because "there was apparently nothing on [his] car which identified

him as a firefighter"). Consequently, Lalowski's speech interests were diminished by the capacity in which he spoke.

In sum, the state's interests in running an efficient and effective police department outweighed Lalowski's speech interests, even in relation to his statements that directly addressed matters of public concern. Indeed, six out of the seven factors that are relevant to the *Pickering* balancing test favor the state's interests over Lalowski's. Consequently, we hold that none of Lalowski's statements to the demonstrators on the morning of May 20, 2006, were constitutionally protected, and we will affirm the district court's grant of summary judgment on Lalowski's speech retaliation claim.

## II.    ADMINISTRATIVE REVIEW CLAIM

Lalowski's challenge to the district court's ruling on his administrative review claim requires some discussion of the proceedings below. The deadline for dispositive motions in the district court was March 26, 2012. On that day, Prandini and the City filed a joint motion for summary judgment on the claims against them, and Lalowski filed a cross-motion for summary judgment on his First Amendment retaliation claim. However, neither the Board nor Lalowski moved for summary judgment on his administrative review claim. Indeed, Lalowski argued that his administrative review claim should not be decided until after his constitutional claims were resolved. In contrast, Prandini and the City took the position (rejected above) that Lalowski's administrative review claim should be decided first because a ruling adverse to Lalowski on that claim would preclude his constitutional claims.

Although the Board did not move for summary judgment, it agreed with Prandini and the City that Lalowski's administrative review claim should be resolved first, and on April 12, it moved to compel Lalowski to file a brief in support of that claim. The district court held a hearing on that motion on April 17, during which the court indicated that it would "review the file and issue an order." However, as of June 19, no order was forthcoming, so the Board filed another motion asking the district court to establish a briefing schedule on the administrative review claim. At a hearing on June 26, the court denied both of the Board's motions and stated that the administrative review issues would be "taken in context with the pending motions for summary judgment." By this time, Lalowski, Prandini, and the City had already filed their responses to the pending motions for summary judgment.

On October 17, after summary judgment briefing was complete, the district court held a hearing on the pending motions. The next day, the court issued a written order granting Prandini and the City's motion for summary judgment, denying Lalowski's motion for summary judgment, and sua sponte granting summary judgment in favor of the Board on Lalowski's administrative review claim. On appeal, Lalowski contends that this latter ruling was improper because he was never given an opportunity to brief his administrative review claim. We agree.

First, we note that summary judgment was the correct procedural mechanism to resolve Lalowski's administrative review claim. That claim is governed by Illinois's Administrative Review Law, which limits judicial review of a state administrative agency's decision to the administrative rec-

ord. *See* 735 I.L.C.S. § 5/3-110 ("No new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency shall be heard by the court."). When a party seeks judicial review of administrative action in a federal district court, and the case is to be decided on the administrative record without further evidence, "the district court resolves the issue [through] summary judgment." *Johnson by Johnson v. Duneland Sch. Corp.*, 92 F.3d 554, 557 (7th Cir. 1996) (citing *Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994)). The problem here is not that summary judgment was used to resolve Lalowski's administrative review claim, but rather that the district court failed to comply with the procedural requirements of summary judgment.

Because no party moved for it, the district court could grant summary judgment on Lalowski's administrative review claim only "[a]fter giving notice and a reasonable time to respond." Fed. R. Civ. P. 56(f). Yet, the court did not notify the parties of its intent to resolve the administrative review claim until after their summary judgment response briefs had been filed. Nor did it allow the parties an opportunity to separately brief that claim before entering summary judgment. Indeed, by denying both of the Board's motions for briefing on the administrative review claim, the court made clear that it would not welcome such briefing. Consequently, the court failed to comply with Rule 56(f), and we must vacate its entry of summary judgment on Lalowski's administrative review claim and remand for further proceedings.

As discussed above, the district court properly entered summary judgment against Lalowski on his First Amend-

ment claim. As a result, all of Lalowski's federal claims have been resolved, and on remand, the district court may decline to exercise supplemental jurisdiction over his state administrative review claim. *See* 28 U.S.C. § 1367(c)(3). In general, "when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1251 (1994). "There are, however, unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness and comity—will point to federal decision of the state-law claims on the merits." *Id.* We leave the decision whether to exercise supplemental jurisdiction over Lalowski's administrative review claim to the sound discretion of the district court on remand.

## III.    CONCLUSION

The district court's entry of summary judgment against Lalowski on his First Amendment claim is AFFIRMED, but the district court's entry of summary judgment against Lalowski on his administrative review claim is VACATED, and the case is REMANDED for further proceedings consistent with this opinion.