In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 23-1091

GARY HICKS,

*Plaintiff-Appellant,*

*v.*

ILLINOIS DEPARTMENT OF CORRECTIONS, ET AL.,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:20-cv-03099 — **Sue E. Myerscough**, *Judge.*

———————————

ARGUED NOVEMBER 29, 2023 — DECIDED JULY 23, 2024

———————————

Before RIPPLE, SCUDDER, and JACKSON-AKIWUMI, *Circuit Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* The Illinois Department of Corrections suspended corrections sergeant Gary Hicks for 10 days after an internal investigation into his Facebook posts—posts a news article described as "Islamophobic" and "offensive." The internal investigation concluded that Hicks violated Department policies banning "conduct that is unbecoming of a State employee or that may reflect unfavorably

on or impair operations of the Department." Hicks sued the Department and various officials connected to the disciplinary process under 42 U.S.C. § 1983, alleging a First Amendment retaliation claim and an as-applied Fourteenth Amendment challenge to the Department's policies. The district court granted summary judgment in favor of the defendants on both claims, and Hicks appeals.

We conclude that Hicks cannot sustain a First Amendment retaliation claim because the Department's interest in managing its affairs outweighs the interest Hicks had in posting the content. Nor can Hicks sustain an as-applied Fourteenth Amendment challenge because someone in his supervisory position would not have to guess that their actions may be "unbecoming of," "reflect unfavorably on," "or impair operations of the Department." We therefore affirm.

## I

### A.  Factual Background

On September 4, 2019, the Chicago Sun Times published an article accusing Illinois Department of Corrections employees of posting "offensive" and "Islamophobic" content on Facebook. One post included statements like, "abortion is murder," "homosexuality is sin," and "Allah is not god." Another post listed "Things We Don't See Jews Doing," including "Flying Planes Into Buildings," "Forcing Young Girls to Marry Old Men," "Mutilating Female Genitalia," "Trying to Dominate the World," and "Trying to Destroy America." A different post depicted a member of the United States House of Representatives, labeling her as "musslamic" and encouraging her arrest. Another post included a prayer: "Dear Lord, if there must be a civil war or a government overthrow, please

let it happen before I am dead or too old to fight in it. Amen." The Department later learned of a fifth post that the news article did not discuss. This post depicted a different United States Representative in a sombrero, referred to her surname as the "Mexican word of the day," and encouraged her to leave "if [she] don't like the USA."

The article identified Gary Hicks as the employee behind the first four posts described above. Indeed, at the time the article ran, Hicks maintained a Facebook profile. He made his profile publicly accessible; anyone could view its content. And on his profile, he listed his occupation as "Corrections Sergeant at Illinois Department of Corrections" and shared a photo of himself in Department uniform.

Sometime before the Chicago Sun Times published the article, a reporter contacted the Department's public information officer to discuss the Facebook posts. The day after the article ran, Rob Jeffreys, Director of the Department, sent an email to all staff reminding them to follow the Department's code of conduct while using social media. Jeffreys would later explain that he sent this email in response to his concern about litigation stemming from Department employees "posting things derogatory about the people we have in custody . . . . along the lines of religion, race, [and] sexuality." At the time, an inmate named Tay Tay led a class of transgender inmates in a lawsuit against the Department for deliberate indifference to harassment and discrimination. The district court in the *Tay* litigation would later reference Facebook posts by Department employees other than Hicks when entering a preliminary injunction against the Department. The *Tay* court found the employees' posts "reflect[ed] ignorance, sexism, and racism," and that a "deep-seeded culture of ignorance,

harassment, and discrimination" existed within the Department.

The media attention prompted Josh Cheek, a Department investigator, to begin an internal investigation into Hicks's social media posts. Investigator Cheek interviewed Hicks, who admitted to the posts and explained they reflected his personal political and religious views. Hicks said his views never impacted his work with the Department.

Investigator Cheek concluded that the social media posts violated the code of conduct. The code requires "employees to conduct themselves in a professional manner and, whether on duty or not, not engage in conduct unbecoming of a State employee or that may reflect unfavorably on or impair operations of the Department." Beyond summarizing the news article and what Hicks said when interviewed, Investigator Cheek's two-page final report did not say much. The report asserted that "the posts do reflect negatively on the [D]epartment as well as the [D]epartment[']s overall mission" and charged Hicks with violating the Department's code of conduct. The Department informed Hicks of the charges.

On October 15, 2019, the Department convened an Employee Review Board Hearing to give Hicks an opportunity to respond to the report. At the hearing, the hearing officer read the charges and heard statements from Hicks, his Union Representative, and a Management Representative. Hicks offered no witnesses other than himself, saying he did not intend the posts to offend anyone. The hearing officer concluded Hicks violated the code of conduct and recommended a 10-day suspension.

Both Jeffreys, the Department's Director, and John Eilers, in a dual role as Chief of Operations and temporary Chief of Staff, approved the 10-day suspension, effective November 4 through November 14, 2019. This was the first and only time the Department disciplined Hicks during his 18 years of employment.

### B. Procedural History

Hicks sued the Department, Jeffreys, Eilers, and three other officials (collectively, "Defendants"), alleging violations of his First Amendment free speech rights and Fourteenth Amendment due process rights.

The district court entered summary judgment for Defendants on both claims. The court held Hicks's suspension did not violate the First Amendment because his posts were not on matters of public concern, he took deliberate steps to link himself and his posts to his government employment, and the Department's interest as an employer outweighed his interest in speaking. Alternatively, the court held, qualified immunity shielded Defendants from the First Amendment challenge because clearly established law does not provide the right to share such posts publicly while identifying oneself as a Department employee. The district court granted summary judgment to Defendants on the Fourteenth Amendment due process claim on qualified immunity grounds, explaining that the law does not clearly establish that the Department's standards were impermissibly vague as applied to Hicks's Facebook activity.

This appeal followed.

## II

Hicks raises several issues on appeal: (1) whether the Department violated his First Amendment rights by suspending him because of his Facebook posts; (2) whether the Department's code of conduct violated the Fourteenth Amendment because it is impermissibly vague as applied to him; and (3) whether the individual Defendants are entitled to qualified immunity for any unconstitutional acts they may have committed. We review these questions de novo, and must reverse the district court's summary judgment decision if we decide that a reasonable jury could have rendered a verdict in favor of Hicks. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

We conclude that the First and Fourteenth Amendment claims are without merit. This also means we need not reach the qualified immunity question.

### A.  First Amendment

As a general matter, protecting the public's interest in having citizens speak about and debate matters of public concern "lies at the heart of the First Amendment." *Lane v. Franks*, 573 U.S. 228, 236 (2014).

But to resolve this appeal, we must consider the First Amendment rights of a specific group: public employees. Public employees do not sign away their free speech rights when answering the call to public service; at the same time, public employees' rights to free speech are not absolute. *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004). In contrast to the government's limited power to restrict the speech of private citizens, the government, as employer, has greater leeway to control the speech of its employees to ensure discipline and

harmony in government operation. *Waters v. Churchill*, 511 U.S. 661, 671–72 (1994). The First Amendment requires us to strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968).

The inquiry into whether a public employer's personnel decision infringed upon an employee's First Amendment rights involves several steps: "[P]ublic employees must present evidence that (1) their speech was constitutionally protected; (2) they suffered a deprivation likely to deter free speech; and (3) their speech was at least a motivating factor in the employer's actions." *Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 571 (7th Cir. 2021). The parties do not dispute Hicks satisfies the second and third elements. They disagree about whether his Facebook posts were constitutionally protected, so we focus on this first element.

To resolve the question of whether the First Amendment protects Hicks's speech, we apply the two-step *Connick/Pickering* test. The first step asks whether the employee spoke "as a citizen upon matters of public concern," as opposed to "as an employee upon matters only of personal interest." *Connick v. Myers*, 461 U.S. 138, 147 (1983). The parties do not dispute that Hicks spoke as a citizen on matters of public concern. So, we can proceed to the second step. Step two involves a balancing: It asks whether the employee's interests in speaking on a matter of public concern outweigh the government's

interest in promoting effective and efficient public services.[1]
*Pickering*, 391 U.S. at 568.

But before diving into step two *(Pickering* balancing), we
address a point of law. The parties cite *Harnishfeger v. United
States*, 943 F.3d 1105 (7th Cir. 2019), for the proposition that
we can take an alternate route to *Pickering* balancing. *Harnish-
feger* explained that a court can arrive at balancing not only if
an employee speaks as a citizen on a matter of public concern
as required by *Connick*, but also if an employee shows that his
speech was neither at work nor about work and the employee
did not take deliberate steps linking himself and his speech to
his employer. *Harnishfeger*, 943 F.3d at 1113–14. *Harnishfeger*
stated that this "different path to *Pickering* [balancing] is avail-
able under *United States v. National Treasury Employees Union*,
513 U.S. 454 (1995) ("*NTEU*")." *Harnishfeger*, 943 F.3d at 1113.
*NTEU* explained, however, that *NTEU* applies to *ex ante* blan-
ket restrictions on speech, whereas *Connick* applies to "*post hoc*
analys[es]" of "isolated disciplinary actions" "taken in re-
sponse to actual speech," which is what Hicks challenges in

---

[1] Because it is a balancing test, the stronger the showing that the
speech touched on a matter of public concern, the greater the burden on
the government to show that its interests should prevail. *See Craig v. Rich
Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1111–21 (7th Cir. 2013). Hicks ar-
gues that his posts were "entitled to the highest rung of First Amendment
protection" because, on appeal, he has explained the posts' political and
religious underpinnings. Defendants argue his Facebook posts "touched
upon matters of public concern in only a most limited sense," if at all. But
we do not consider the NPR, New York Times, and Newsweek articles
that Hicks cites on appeal because Hicks failed to call the district court's
attention to these facts. And it would not matter if we labeled his free
speech interests as substantial or limited: As discussed below, the govern-
ment's interests are weighty enough to outweigh his right to speak freely
either way.

this case. *NTEU*, 513 U.S. at 467–68, 475 n.21. Nonetheless, we could not walk the alternative path *Harnishfeger* sets out even if we tried: Hicks *did* take deliberate steps linking himself and his speech to the Department, as evidenced by his decision to include his occupation and a photo of himself in Department uniform on his publicly accessible Facebook page. Because this aspect of the *Harnishfeger* formulation is not met, this case does not qualify to proceed to *Pickering* balancing via the *Harnishfeger* framework, though it can via *Connick* (which, again, asks only if an employee speaks as a citizen on a matter of public concern). And even if we could take the *Harnishfeger* route, we—like the *Harnishfeger* court—arrive at the same place: *Pickering* balancing.

Let's return to the task of applying the *Connick/Pickering* test to the facts before us. Again, step two requires a balancing: do the employee's interests in speaking on a matter of public concern outweigh the government's interest in promoting effective and efficient public services? This second part of the test contemplates a fact-specific inquiry into several interrelated factors:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the

> speaker should be regarded as a member of the
> general public.

*Bonds v. Milwaukee Cnty.*, 207 F.3d 969, 981 (7th Cir. 2000). We cannot "merely count how many factors line up on each side—one factor of great weight may offset several which lean slightly in the other direction." *Volkman v. Ryker*, 736 F.3d 1084, 1092 (7th Cir. 2013).

In balancing these interests, we must also consider the "nature of the employer-employee relationship in the paramilitary context of a correctional center." *Id*. Law enforcement agencies tasked with protecting and maintaining correctional centers function as "paramilitary organizations" charged with maintaining public safety and order. *Id.* (citation omitted). As a result, they receive more latitude in their discipline decisions and personnel regulations than an ordinary government employer. *Id.* "In such contexts, we afford considerable deference to the government employer's assessment of the risks that employee speech creates." *Id.* (cleaned); *Lalowski v. City of Des Plaines*, 789 F.3d 784, 793 (7th Cir. 2015) ("We have recognized that there is a particularly urgent need for close teamwork among those involved in the high stakes' field of law enforcement. Speech that might not interfere with work in an environment less dependent on order, discipline, and esprit de corps could be debilitating to a police force." (cleaned)).

A government employer need not prove that the employee's speech actually disrupted efficiency; rather, the employer's burden is to show "'the potential disruptiveness' of the employee's speech." *Lalowski*, 789 F.3d at 792–93 (citations omitted). The employer is not required to wait until operations actually disintegrate if immediate action might prevent

such disintegration. *Id.*; *Connick*, 461 U.S. at 152 ("[W]e do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action."); *Waters*, 511 U.S. at 673 (plurality opinion) (granting "substantial weight to government employers' reasonable predictions of disruption").

We conclude that the Department's interest in efficiency and preventing disruption outweighed any interest Hicks had in sharing the five posts on his Facebook profile.

First, Hicks's Facebook activity had the potential to interfere with Department operations, discipline, and relationships, for three reasons. One, by espousing disparaging views about groups that may be present in the prison or staff population, Hicks "positioned himself in opposition to the goals of his employer." *Lalowski*, 789 F.3d at 791. This is because the Department must police the populations Hicks targeted and it might employ members of the same populations to do the policing. Even if members of these populations had not yet learned of his posts, "the potential for disruption is readily apparent." *Id.* at 791–92. Two, the adverse public exposure prompted by the news article threatened to erode community trust and impair its operations. Indeed, the article referred to the posts as "offensive" and "Islamophobic," and the article—and therefore the posts—remains publicly available to this day. Three, the Department has a reasonable, well-founded concern about legal exposure from derogatory social media posts by employees. Recall that the Department was already defending a lawsuit on this front and the court in that case concluded the derogatory social media posts reflected the

severity and pervasiveness of the Department's hostility toward transgender inmates.

Hicks argues that this first factor—the potential to interfere with Department operations, discipline, and relationships—favors him and, if we conclude otherwise, we greenlight what he asserts are post hoc justifications by the Department for the disciplinary decision. We disagree. The record shows that, contrary to Hicks's assertion, the news article caused the Department's concern about negative public exposure. The article set several events in motion, including Jeffreys's email reminding staff to observe the code of conduct while using social media, and the internal investigation that resulted in a report explaining that Hicks's posts (nearly all of which featured in the article) "reflect negatively on the [D]epartment." Also contrary to Hicks's assertion, the Department did not need to experience actual disruption before disciplining him. The potential for disruption was enough. *See id.* at 792–93. Nor do we find persuasive Hicks's contention that the Facebook posts were not "inherently" or "terribly offensive." "[C]ourts look to the facts as the employer reasonably found them to be," not as viewed by the employee, a court, or a jury. *Waters*, 511 U.S. at 677 (emphasis omitted). The record leaves us with no doubt that the Department reasonably found the posts harmed its reputation and threatened its operations. We therefore accord substantial weight to the Department's interest in preventing Hicks from causing further disruption.

Second, the employment relationship between Hicks and the Department required loyalty and confidence. Hicks's prayer to participate in a government overthrow and disparaging populations to which staff members may belong

conflict with the Department's expectation of loyalty from employees, which is especially important in a paramilitary context. This factor favors Defendants, too.

Third, Hicks's posts conflicted with his responsibilities as a supervisor. "Supervisors are tasked with enforcing rules and regulations." *Volkman*, 736 F.3d at 1092. When a supervisor expresses interest in participating in a government overthrow, he undermines the staff and inmates' respect for rules and chain-of-command. *Id.* And because the posts support the conclusion that Hicks is not an impartial decisionmaker, staff and inmates may grow wary of working with him or following his orders. *See, e.g.*, *Craig*, 736 F.3d at 1113 (explaining female students would be especially reluctant to seek counseling services from a public employee who wrote a book expressing sexist views). Alternatively, his role as a supervisor may encourage supervisees to carry bias further down the chain of command. *See Weicherding v. Riegel*, 160 F.3d 1139, 1143 (7th Cir. 1998) (concluding, in a case concerning televised support of the Ku Klux Klan, that "[the plaintiff's] position as sergeant, an intermediate management position at [the prison], [] weighs in favor of the defendants, because managers set an example for the subordinate employees"). We need not second-guess the Department's conclusion that the example Hicks set through his conduct as a supervisor jeopardized effective operations. This conflict between Hicks's managerial position and his Facebook activity also weighs in the Department's favor.

Fourth, the time, place, and manner of the speech do not help Hicks. Although Hicks posted the content in question while off duty, his activity did not constitute, as he argues, "private" messages: he set his Facebook profile such that

anyone could view the five posts, and any member of the public or Department could have come across them. Further, even assuming—we think generously—that Hicks meant to communicate something of value to public discourse, the derogatory language and images Hicks used did more than necessary to contribute to the conversation. *Lalowski*, 789 F.3d at 792 (noting the manner of the employee's speech weighed against the employee because "[h]is words and deeds were abusive and degrading," "going far beyond what was necessary to communicate his displeasure with [the protesters'] methods"). This factor also goes to the Department.

Finally, visitors to Facebook could not regard Hicks as a member of the general public when he posted the content at issue here. He made sure of that by listing his position as a corrections sergeant, listing the Department as his employer, and posting a photo of himself in uniform. These things made it easy to identify Hicks as a Department employee—just as the news reporter did—and created the risk that someone would associate his posts with the Department. *Id.* at 793 (concluding the plaintiff did not speak as a member of the public because he represented himself as an off-duty police officer and "made sure demonstrators remembered him as a police officer"); *see Coady v. Steil*, 187 F.3d 727, 733 (7th Cir. 1999) (finding that an off-duty firefighter who displayed a political sign on his car was not "speaking as a firefighter" because "there was apparently nothing on [his] car which identified him as a firefighter"). This factor further tips the scale in the Department's favor.

In sum, even if we assume the posts contributed to informed debate, we conclude the Department's interest in workplace efficiency and preventing disruption outweighed

any interest Hicks had in commenting as he did. Having concluded that the *Connick/Pickering* test favors the Department, we hold that the district court properly granted summary judgment in favor of the Defendants on the First Amendment retaliation claim.

## B. Fourteenth Amendment

We now turn to Hicks's as-applied Fourteenth Amendment challenge to the Department's code of conduct.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). But regulations "are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963). The question whether a regulation is unconstitutionally vague is determined by whether it is crafted with sufficient clarity to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned*, 408 U.S. at 108.

Unlike laws applicable to the general public, "the government acting in the role of employer enjoys much more latitude in crafting reasonable work regulations for its employees." *Greer v. Amesqua*, 212 F.3d 358, 369 (7th Cir. 2000). Thus, a code of conduct for public employees is impermissibly vague only if it fails to "convey adequate warning" to "reasonable employee[s]" as to a "sufficiently define[d] [ ] range of inappropriate conduct" that may result in discipline. *Id.*

Hicks cannot credibly assert that the code of conduct is impermissibly vague as applied to his social media activity. His Facebook posts so contradict his role as a corrections sergeant

that no reasonable officer could claim confusion about the code of conduct's application. It is one thing to participate in controversial public discussions about politics, religion, race, culture and sexuality; it is another to use derogatory language and stereotypes about the very populations an officer is tasked with safeguarding and supervising. And the code of conduct provides more than adequate warning to a reasonable employee charged with protecting the public that posting language suggesting joyful anticipation of a government overthrow or civil war is "unbecoming" of the employee and "may reflect unfavorably" on the Department.

Because the code of conduct is not unconstitutionally vague as applied to a supervising officer who posts the content at issue here, we affirm the district court's judgment on the Fourteenth Amendment due process claim.

### III

For these reasons, the judgment of the district court is AFFIRMED.