In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 24-1026

DANIEL CHRISTENSEN
and PAULA CHRISTENSEN,

*Plaintiffs-Appellants,*

*v.*

WILLIAM WEISS, *et al.,*

*Defendants-Appellees.*

_____

Appeal from the United States District Court of the
Western District of Wisconsin.
No. 3:22-cv-00253 — **James D. Peterson**, *Chief Judge.*

_____

ARGUED SEPTEMBER 27, 2024 — DECIDED JULY 29, 2025

_____

Before BRENNAN, JACKSON-AKIWUMI, and PRYOR, *Circuit Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* After twenty-five days at the jail in Vilas County, Wisconsin, twenty-year-old Donna Christensen died by suicide. Jail staff discovered her body during an hourly cell check and unsuccessfully attempted to revive her. Twenty days earlier, she had complained of suicidality, hallucinations, and drug withdrawal.

The Christensens, who are Donna's parents and the administrators of her estate, sued Vilas County, the jail's contracted medical service provider, and employees of both entities. Their complaint attributed Donna's death to a combination of factors including the conditions of her confinement, inadequate medical treatment, and excessive force and due process violations by jail staff. Presented with cross motions for summary judgment, the district court ruled in favor of all defendants and against the Christensens. The Christensens challenge the district court's summary judgment decision, plus the denial of their requests to amend their complaint and extend deadlines. Because the district court did not commit reversible error, we affirm. We do so while acknowledging that this is a tragic case where the unspeakable suffering of a young woman and her family might have been avoided.

## I

We begin with the facts, construed in a light most favorable to the Christensens as the party against whom the winning motion for summary judgment was made. *See Med. Protective Co. of Fort Wayne, Ind. v. Am. Int'l Specialty Lines Ins. Co.*, 911 F.3d 438, 445 (7th Cir. 2018). We construe all reasonable inferences in the Christensens' favor too. *Id.*

### A. Booking, Discipline, and Suicide Watch

Donna Christensen had a history of substance abuse and mental illness. She also had prior convictions for bail jumping and possession of drug paraphernalia. She was on probation for those convictions in 2020 when she was placed on a "probation hold" for failing to meet with her probation officer.

On October 1, 2020, Donna voluntarily turned herself into the tribal police (she was a member of the Lac du Flambeau

Ojibwe), who then transferred her to Vilas County Jail pursuant to the probation hold. During one of Donna's previous jail stays earlier in 2020, staff noted that she took medication for depression and reported having attempted suicide in a variety of ways. She had also reported having "high moods and low moods" since she was fourteen years old and anger management issues.

When screened during the booking process on October 1, Donna did not express present or past thoughts of suicide. She did, however, test positive for amphetamines, methamphetamines, and THC. An officer requested medical attention for Donna's withdrawal symptoms, but the jail never provided any. Meanwhile, on October 2, a registered nurse, Linda Thayer, reviewed Donna's intake form.

At the time of Donna's booking, the jail was placing all incoming inmates on a fourteen-day quarantine. After two days at the jail, Donna registered a high temperature so a physician placed an order for a COVID-19 test. The next day, on October 4, officers moved Donna from a receiving cell to a medical segregation cell to continue quarantining while she waited for the test results.

On October 6, while in the medical segregation cell, Donna had an encounter with two officers: Sam Malone and Brent Wilmot. According to Malone's report, Donna asked for soap and began to kick and scream when Malone told her she would have to wait a bit. In response, Malone turned off Donna's television remotely and told her to stop acting like a twelve-year old "throwing a temper tantrum." This prompted Donna to break her television remote and cover the window of her cell with toilet paper. Malone requested assistance, and Wilmot responded. Wilmot and Malone arrived at Donna's

cell together, at which point Donna said, "Here take this," before throwing her Styrofoam tray at Wilmot and covering herself with her blanket. Malone responded by removing Donna's blanket and pulling her mattress pad from underneath her.

The parties dispute what happened next. The Christensens argue that Donna fell forward into Wilmot and placed her hands on his chest to balance herself. Vilas County, on the other hand, asserts that Donna stood up and shoved Wilmot. Everyone agrees that, following the contact, Wilmot pushed Donna onto her mattress-less bunk and briefly restrained her with his body weight. Jail Administrator William Weiss testified that he watched this October 6 encounter on video but did not discuss it with Wilmot, did not act on the video, and did not inform the Sheriff.

During the October 6 encounter, Donna said, "like that's gonna stop me from killing myself." Wilmot asked her if she was going to kill herself and she responded, "watch me." Malone and Wilmot then grabbed Donna's arms and escorted her to a room to change into a suicide smock. Donna resisted the entire trip and refused to change into the smock. As officers, now four in number, tried to convince her to change, Donna stated several times that she was hearing voices that had "followed her into the jail" and were telling her to "kill herself," and that she "can't be alone in the cell anymore with the voices." According to Malone's report, Donna also commented that she had bi-polar disorder, she was only "normal" when she was on meth, and she was now vegan because "people on the outs were eating people." Eventually, after being put into a restraint chair, Donna changed into the smock and

staff initiated a suicide watch during which they observed her every fifteen minutes.

Later in the day on October 6, Wilmot served Donna with disciplinary papers for ten days of administrative segregation (solitary confinement). When doing so, he asked her to sign a waiver of her right to a due process hearing on the disciplinary matter. Donna remarked, "ten days is a long time to be alone." In response, Wilmot promised if Donna signed the waiver, he "would put her by people once her COVID test came back negative." Wilmot never told Donna that the ten days of administrative segregation would result in her being reclassified as a maximum-security inmate, which would trigger an additional twenty days of solitary confinement (twenty-three hours of isolation daily).

The day after the physical encounter, while still on suicide watch, Donna met with Kayla Ziemba, the jail's mental health professional. At the time, Ziemba was an advanced practice social worker practicing under the supervision of psychologist Melissa Caldwell. Notably, Ziemba had previously worked with Donna, meeting with her once every other month for two or three years starting when Donna was approximately fifteen years old. During the October 7 assessment, Donna reported having thoughts of self-harm "all the time." Ziemba concluded that Donna should remain on suicide watch because Donna was experiencing thoughts of self-harm and auditory hallucinations instructing her to kill herself. When Ziemba shared this recommendation with Donna, Donna called Ziemba a "bitch" and said she would not talk to Ziemba at the next visit.

The following day, October 8, Ziemba met with Donna for another assessment. At that meeting, Donna reported that she

no longer suffered suicidal ideations. She also reported that she had a headache and was shaking due to drug withdrawal. After this second assessment, Ziemba recommended that Donna be removed from suicide watch and returned to the general population. The assessment lasted only a few minutes, and jail administrators approved Ziemba's recommendation within ten minutes of Ziemba beginning the meeting with Donna. During both assessments, Ziemba was aware of Donna's previous suicide attempts. In terms of treatment, Ziemba provided Donna only with "support and encouragement" during these assessments.

**B. Post-Suicide Watch Developments and Death**

Because Donna was no longer on suicide watch and had tested negative for COVID-19, jail staff transferred her to a cell in the jail's D-block on October 8, shortly after Ziemba's second assessment. At the time, there were at least two other inmates in the D-block. But between October 16 and her death on October 26, Donna was the only inmate in the D-block because she was the only female inmate classified as maximum-security after October 16.

On October 12, Ziemba conducted a follow-up telehealth appointment with Donna. During the appointment, Donna told Ziemba that she believed she had behaved the way she did on October 6 because of her prior drug use and withdrawal. Donna denied having any ongoing thoughts of self-harm. Accordingly, Ziemba noted that Donna was stable.

Four days later, on October 16, Donna saw Thayer, the registered nurse, for her mandatory initial medical visit. During that visit, Donna reported that she was not on any medications outside of the jail but used alcohol, THC, and

methamphetamines occasionally. She also denied any current suicidality, history of suicide attempts, or history of harm. Thayer saw Donna again eight days later, on October 22. Thayer ordered a prescription ointment to treat Donna's eczema. Donna did not raise any other complaints with Thayer that day.

On October 20, Ziemba saw Donna in person for another follow-up assessment. According to Ziemba's notes, the meeting was "unremarkable, and Donna continued to report no thoughts of self-harm or suicidal ideation." This was Ziemba's last time meeting with Donna, and her notes reflect that Donna did not make "any further request for mental health care."

On the day of Donna's death, October 26, ten different officers checked on Donna every hour through 9:30 p.m. None of those officers reported observing anything of concern. At approximately 7:54 p.m., Donna had a recorded, twenty-minute video call with a friend. Following the call, she could be heard crying in her cell for about ten minutes. Later, at around 8:48 p.m., officers removed trash from her cell and noticed nothing unusual. Then, during a cell-check at roughly 10:30 p.m., Officer Joyce Kranzusch discovered Donna hanging by a bed sheet from her bunk. Kranzusch radioed for help and began performing CPR. Paramedics arrived at Donna's cell by 10:41 p.m., but they could not revive her. She was pronounced dead at the scene.

### C. District Court Proceedings

In 2022, the Christensens sued two groups of defendants. One group included Vilas County, Vilas County Sheriff Joseph Fath, Jail Administrator William Weiss, and Jail Sergeant Brent Wilmot (collectively, "Vilas County Defendants"). The Christensens later amended their complaint to add the jail's contracted medical service provider, Advanced Correctional Healthcare ("ACH"), and three of its employees: social worker Kayla Ziemba, nurse Linda Thayer, and physician assistant Gregory Scott (collectively, "ACH Defendants"). The Christensens' amended complaint alleged constitutional torts under the Eighth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983, as well as pendant state law claims.

After a few months passed, the district court entered a pretrial conference order setting various deadlines for discovery and dispositive motions. There was some confusion over the deadlines, and the court extended the summary judgment deadline in part to account for that confusion. The day of that deadline, both groups of defendants moved for summary judgment.

Two weeks later, the Christensens submitted a slew of filings, including a motion for extension of time to respond to the summary judgment motion so that they could conduct additional discovery. The judge denied that extension motion. Having been denied an extension, the Christensens filed briefs in opposition to the defendants' summary judgment motions that same day. Two days later, they moved for leave to file an expert declaration by Dr. Amber Carda, a psychologist, in support of their opposition briefs. The court denied that motion and a related motion for reconsideration.

Nine months after the deadline to file pleadings, the Christensens sought leave to file a second amended complaint.

They wished to add two defendants: (1) Jail Officer Samantha Malone, who witnessed the incident between Donna and Wilmot; and (2) Dr. Melissa Caldwell, the ACH employee who supervised Ziemba. The court denied the motion on the grounds of undue delay and unfair prejudice.

After denying the Christensens' various motions as outlined above, the district court granted summary judgment in favor of both groups of defendants.

## II

We first address the district court's grant of summary judgment to both groups of defendants. Summary judgment is merited when the movant shows there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Smith v. Kind*, 140 F.4th 359, 364 (7th Cir. 2025) (citation modified). "A factual dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 661 (7th Cir. 2016) (citation modified). Applying this standard, the district court determined that no jury could find in the Christensens' favor on their federal law claims. We review a decision to grant summary judgment de novo. *Brown v. Osmundson*, 38 F.4th 545, 549 (7th Cir. 2022).

Our circuit has not yet settled whether claims brought by inmates on a probation hold are governed by the Eighth Amendment or the Fourteenth Amendment. *See Est. of Clark v. Walker*, 865 F.3d 544, 546 n.l (7th Cir. 2017). But we need not resolve the question in this case. In their reply brief on appeal, the Christensens insist they brought their suit under both the Eighth and Fourteenth Amendments. The record, however,

shows otherwise. The Christensens included a Fourteenth Amendment theory of liability in their amended complaint and then proceeded in their summary judgment briefing to present only an Eighth Amendment theory. The defendants followed suit in their own briefing with a focus on the Eighth Amendment, and so did the district court. And, on appeal, the Christensens developed only the Eighth Amendment theory in their opening brief. Thus, without settling the question of which amendment ought to govern, we defer to the parties' assumption that the Eighth Amendment applies. *Cf. Stockton v. Milwaukee County*, 44 F.4th 605, 614 n.3 (7th Cir. 2022) (holding that plaintiff waived the question of whether another amendment governed where both parties presumed the Eighth Amendment did).

Eighth Amendment conditions of confinement claims require a showing of deliberate indifference. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (holding that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment" (citation modified)); *see also Farmer v. Brennan*, 511 U.S. 825, 847 (1994) ("[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if [1] he knows that inmates face a substantial risk of serious harm and [2] disregards that risk by failing to take reasonable measures to abate it."). Thus, to succeed on their claim, the Christensens must establish that Donna had an objectively serious medical condition and an official was deliberately indifferent to that condition. *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020).

All parties agree that Donna's suicidality was a serious medical condition. So, our analysis turns to whether the record reveals a genuine dispute of material fact about whether the defendants showed deliberate indifference to that condition. Under the Eighth Amendment, this question of fact is a subjective one. A plaintiff must "demonstrat[e] that a prison official knows of a substantial risk of harm to an inmate and 'either acts or fails to act in disregard of that risk.'" *Id*. (quoting *Gomez*, 680 F.3d at 865). And a plaintiff can demonstrate this "in the usual ways, including inference from circumstantial evidence." *Tackett v. Dauss*, 132 F.4th 1026, 1030 (7th Cir. 2025) (quotation omitted). The district court found that the Christensens' claim necessarily failed on this question. We agree.

The Christensens argue a reasonable jury could find that Wilmot, Weiss, and Ziemba were deliberately indifferent to Donna's suicide risk given three considerations: (1) Donna's mental illness, history of suicide attempts, and statements that she would take her own life; (2) the lack of meaningful evaluation before the jail released Donna from suicide watch; and (3) the prolonged period of solitary confinement. Moreover, the Christensens posit that the defendants fell short of their constitutional duty by failing to take "minimal steps" such as those outlined in their brief:

> [1] increased monitoring, [2] initiation of medical referral to permit a diagnosis and treatment plan for [Donna's] mental illness and/or withdrawals contributing to her vulnerability, [3] removing the most obvious means for suicide until [Donna] is evaluated for mental illness and suitability for ongoing solitary confinement, or

[4] at least put [Donna] back "by people" as she
was promised.

The defendants respond that the Christensens failed to
meet their burden of establishing deliberate indifference. Ac-
cording to the ACH Defendants, there is no triable issue of
fact: Ziemba, Thayer, and Scott were not subjectively aware
that Donna presented an imminent and substantial risk of
self-harm at the time of her death, they argue. Similarly, the
Vilas County Defendants assert that there was no evidence
that Wilmot was deliberately indifferent to Donna's risk of
self harm or Weiss was liable as his supervisor.

For purposes of the Eighth Amendment, deliberate indif-
ference poses a "high hurdle and an exacting standard." *Don-
ald*, 982 F.3d at 458 (citation modified). When it comes to med-
ical issues, this can be a difficult burden to meet. Negligence
or mistakes in medical judgment do not amount to deliberate
indifference under the law, nor does evidence that a different
medical professional would have chosen a different course of
treatment. *See id.*; *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir.
2016). Notably, "an official's failure to alleviate a significant
risk that he should have perceived but did not, while no cause
for commendation, cannot under our cases be condemned as
the infliction of punishment." *Farmer*, 511 U.S. at 838.

Under this exacting standard, the Christensens have not
presented sufficient evidence from which a reasonable jury
could find that any of the defendants' conduct rose to the level
of deliberate indifference. The defendants may have made un-
wise decisions, such as releasing Donna from suicide watch
without a more robust evaluation and then effectively isolat-
ing her. And may not have perceived a risk they should have,
such as the possibility that she was either still suicidal or that

she could suddenly become so under her conditions. But more is needed to show deliberate indifference where Donna denied suicidality for eighteen days before her death and did not otherwise raise concerns during the days and hours before her death, during which staff regularly checked on her.

Perhaps with that high standard in mind, the Christensens focus much of their argument on Ziemba's qualifications to provide mental health care rather than her conduct itself. Specifically, they argue that Ziemba was not sufficiently supervised as required by state law. They draw inspiration for this argument from a decision by a district court in our circuit. *See Mombourquette ex rel. Mombourquette v. Amundson*, 469 F. Supp. 2d 624, 640 (W.D. Wis. 2007) (finding a triable issue as to whether a nurse "was qualified to make a determination that plaintiff was no longer at risk for harming herself" in case where defendant nurse failed to show she was qualified to make risk assessments).

But Wisconsin state law expressly permitted someone like Ziemba to perform the duties of a Licensed Clinical Social Worker, which is a qualified mental health professional according to state law, and to do so under the supervision of someone like Caldwell. *See* Wis. Stat. § 457.04(4); Wis. Admin. Code § MPSW 6.02; Wis. Admin. Code § MPSW 6.04. And the Christensens have not established—through expert testimony, for example—that Caldwell's supervision of Ziemba fell below the professional standard required by state law. We have rejected similar challenges for this reason. *See, e.g.*, *Minix v. Canarecci*, 597 F.3d 824, 832–33 (7th Cir. 2010) (concluding that employee of jail's contracted mental health services provider was a qualified mental health professional under Indiana law despite lack of relevant academic degree or

licensure). That conclusion is even more justified here where Ziemba's qualifications were specifically greenlit by Wisconsin law, unlike the much broader Indiana statute at issue in *Minix*. *See id.* at 832 (citing 405 Ind. Admin. Code § 5-21-1(c)).

In addition to questioning Ziemba's qualifications as part of their Eighth Amendment argument, the Christensens spotlight what they see as excessive force. They argue that Wilmot used excessive force during his October 6 encounter with Donna, contributing to the conditions that caused her suicide. According to the Christensens, Wilmot caused Donna to fall into him and then he responded disproportionately by physically restraining her. The district court rejected this excessive force argument, citing surveillance footage of the encounter: "Plaintiffs' foundational premise … [wa]s flatly contradicted by the video evidence." *Christensen v. Weiss*, No. 22 Civ. 253, slip op. at 2 (W.D. Wis. Dec. 7, 2023). The video evidence, the court concluded, "d[id] not show that Donna 'fell' into Wilmot," and therefore "no reasonable jury could conclude from the video evidence that Wilmot engaged in excessive force." *Id.*

We have, as we must, taken an independent look at the issue. And although courts may disregard a party's version of events where a videotape shows the party's account to be a "visible fiction," *Scott v. Harris*, 550 U.S. 372, 381 (2007), we have cautioned against doing so where videos are subject to different interpretations. *Compare Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (where video "firmly settles a factual issue," court will not "indulge stories clearly contradicted by the footage"), *with Smith v. Finkley*, 10 F.4th 725, 747 (7th Cir. 2021) ("Not surprisingly so—videos, or portions of them, can be viewed differently."). Here, the surveillance videos do not

clearly resolve the question of whether Donna fell into Wilmot or shoved him. But, as captured in a later recording of Donna in the restraint chair, Donna admitted she pushed Wilmot, stating "I barely shoved you." Her admission, taken together with the video evidence, is enough to resolve the factual dispute in favor of the Vilas County Defendants. On this record, we conclude no reasonable jury could find that Wilmot used excessive force and therefore violated Donna's rights. And absent an underlying constitutional deprivation, no reasonable jury could find Weiss liable in his supervisory capacity either. *Stockton*, 44 F.4th at 619.

Before concluding our discussion of the summary judgment decision, we note that the Vilas County Defendants argue summary judgment was also warranted on the basis of qualified immunity. Because we conclude that the Christensens' Eighth Amendment claim fails on the merits, we do not reach the question of qualified immunity. *See Hicks v. Ill. Dep't of Corr.*, 109 F.4th 895, 900 (7th Cir. 2024).

**III**

Having resolved the dispute at the heart of this appeal, we turn to the Christensens' challenge to the orders denying them more time to conduct additional discovery, permission to supplement the record, and permission to file a second amended complaint. We review these decisions by the district court for abuse of discretion. *F.C. Bloxom Co. v. Tom Lange Co. Int'l, Inc.* 109 F.4th 925, 936 (7th Cir. 2024) (discussing standard for Rule 56(d) motions); *Miller v. Chi. Transit Auth.*, 20 F.4th 1148, 1153 (7th Cir. 2021) (same for motions for leave to file); *Ewing v. 1645 W. Farragut LLC*, 90 F.4th 876, 892 (7th Cir. 2024) (same for motions for leave to amend). And for the reasons discussed below, we conclude there was none.

**A. Motion to Extend Time**

Two weeks after the extended summary judgment deadline passed, the Christensens filed a motion to conduct additional discovery. The district court denied the motion for a failure to identify need and for lack of diligence. Federal Rule of Civil Procedure 56(d) provides that courts may allow for extra time if a nonmovant "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to a motion for summary judgment.]" FED. R. CIV. P. 56(d). In this case, the Christensens bore the burden to make that showing as the nonmovant. *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 877 (7th Cir. 2021). "As is true for most matters relating to discovery, the district court has substantial discretion in ruling on a Rule 56(d) motion." *Smith v. OSF Healthcare Sys.*, 933 F.3d 859, 865 (7th Cir. 2019) (citation omitted).

On appeal, the Christensens argue that the district court abused its discretion in denying their motion because they showed both diligence and need. The district court identified several specific shortcomings with the Christensens' request. First, the Christensens did not communicate how Scott, Thayer, or Caldwell's depositions would help to defeat the summary judgment motion. Second, the Christensens did not explain why they waited to depose Caldwell until June when they knew as early as April that they wanted to depose her. Third, the Christensens did not explain why they waited until the eve of summary judgment to schedule Weiss's deposition, during which they later found out about Caldwell's role. In light of these specific and reasoned findings, we cannot say that the district court abused its discretion in denying the motion.

### B. Motion for Leave to Supplement Record

In addition to denying the motion for extra time, the district court also denied the Christensens' motion for leave to supplement the record with an expert declaration from Dr. Amber Carda. If a filing deadline passes, Federal Rule of Civil Procedure 6(b) provides that district courts may, for good cause, grant a post-hoc motion for leave to file if the moving party "failed to act because of excusable neglect." FED. R. CIV. P. 6(b)(1)(B). To determine whether a stated reason qualifies as "excusable neglect," the Supreme Court has articulated the following considerations: "[1] the danger of prejudice to the [non-moving party], [2] the length of delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith." *Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993) (citation omitted).

The district court made findings adverse to the Christensens on each consideration. One, granting the motion would have prejudiced the Vilas County and ACH defendants because they would not know how to respond to the declaration without revised summary judgment briefing from the Christensens. Two, filing the declaration would have resulted in an impermissible delay if the Christensens resubmitted their briefing in opposition to both defendant groups' summary judgment motions. Three, there was no good reason for the delay because the Christensens could have avoided the situation "in at least three ways," including by preparing the evidence sooner (rather than "waiting two days before [the] summary judgment deadline to ask [the] witness to review the declaration"); immediately seeking to suspend briefing

when the witness did not respond to counsel's communications; and submitting an amended brief in opposition and proposed findings of fact incorporating the declaration.

Because the district court properly assessed the relevant considerations, there was no abuse of discretion. Further, even if the district court had erred in denying the motion for leave to supplement the record, any error did not result in substantial prejudice to the Christensens because the court nonetheless considered the declaration at issue. *See Wolf v. Riverport Ins. Co.*, 132 F.4th 515, 522 (7th Cir. 2025) ("We also will not reverse the district court's [discovery] decision absent a clear showing that the denial of discovery would result in actual and substantial prejudice to the complaining litigant." (citation modified)).

### C. Motion for Leave to File Amended Complaint

Finally, the Christensens challenge the district court's refusal to grant them leave to file a second amended complaint. We review a district court's decision to deny a motion for leave to file amended pleadings "under the highly deferential abuse of discretion standard, reversing only if the district court refused to grant the leave 'without any justifying reason.'" *Ewing*, 90 F.4th at 892 (quoting *Soltys v. Costello*, 520 F.3d 737, 743 (7th Cir. 2008)). As a general rule, courts "should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). But a "district court[] may deny leave to amend where there is a good reason to do so, such as futility, undue delay, prejudice, or bad faith." *White v. Woods*, 48 F.4th 853, 860 (7th Cir. 2022) (citation modified).

Recall, the district court concluded that granting the motion would cause both undue delay and unfair prejudice. As

for delay, the court reasoned: "[P]laintiffs should have been more diligent in pursuing discovery once it began and at the very least should have moved promptly to amend their complaint in April, knowing the dispositive motion deadline was imminent." *Christensen v. Weiss*, No. 22 Civ. 253, slip op. at 3 (W.D. Wis. June 29, 2023). As for unfair prejudice, the court reasoned: "because [Malone and Caldwell's] defenses could affect those already asserted (and briefed) by the current defendants, fairness would require the court to permit the current defendants to withdraw their fully-briefed motions and file new ones." *Id.* On appeal, the Christensens challenge that reasoning, arguing that they acted diligently and their amended complaint would have not caused the defendants to suffer any significant prejudice.

The Christensens' challenge is without merit. First, as the defendants point out, the Christensens filed their motion one week after motions for summary judgment were fully briefed and nine months after the deadline set by the district court for amendments without leave. And the Christensens were aware of Malone's role in the developments before filing suit but waited more than eleven months to depose her. So too were they aware since at least September 2022 that Caldwell was Ziemba's supervisor, which was more than nine months before they moved to add Caldwell as a defendant. Finally, the district court's decision to deny the motion certainly did not lack "any justifying reason." *See Soltys*, 520 F.3d at 743 (citation modified).

The Christensens cannot convincingly argue that defendants would not be prejudiced by their requests for more time. And they cannot dispute that they knew of both Malone and Caldwell's identities and roles months before their motion to

amend their complaint. We therefore find no abuse of discretion in the district court's case management decisions.

## IV

Confronted with a devastating tragedy that might have been avoided, the Christensens understandably seek accountability. But their theory of liability is a difficult one to support as a matter of law. And, on the record before us, we cannot see how a reasonable jury could make the findings needed to rule in their favor. We also cannot say the district court abused its discretion when managing this litigation.

The judgment of the district court is AFFIRMED.