In the

# United States Court of Appeals

### For the Seventh Circuit

No. 24-2833

DEREK HUNDLEY, *et al.*,

*Plaintiffs-Appellants*,

*v.*

DEE DEE BROOKHART, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:21-cv-03026-CRL-KLM — **Colleen R. Lawless**, *Judge*.

ARGUED DECEMBER 8, 2025 — DECIDED JUNE 9, 2026

Before ROVNER, JACKSON-AKIWUMI, and MALDONADO, *Circuit Judges*.

ROVNER, *Circuit Judge*. When a wheelchair-dependent inmate refused to place his hands into a "cuffing port" to have his handcuffs removed, appellant Correctional Lieutenant Derek Hundley found himself contemplating how to proceed. Ultimately, his supervisors at the Illinois Department of Corrections ("Department") concluded that Hundley made the wrong choice—opting for force where it was not yet required,

in violation of Department rules. Consequently, the Department discharged him along with fellow officers Robert Kamp and Travis Ochs for violations of Department use-of-force rules. The officers sued the Department along with the Illinois Civil Service Commission ("Commission") and several of its employees claiming that by terminating them for violating a rule that was unconstitutionally vague, the defendants violated their Fourteenth Amendment rights to due process of law.

**I**.

According to the plaintiffs, leaving an inmate handcuffed in a cell is against prison rules, so Hundley sought a different solution. Hundley testified during the Commission hearing that he did not want to activate the tactical team, the group that has special training in extracting inmates from cells, as he believed it was better to go into the cell and try to retrieve the handcuffs himself. Another possibility would have been to alert a supervisor—as is common protocol when unusual incidents occur—but Hundley also disregarded that option. Instead, he assembled four other correctional officers to assist him—Kamp, Ochs, Joshua Slunaker, and Robert Walker—the latter two of whom are not parties in this suit. Hundley testified that the prison's training manual instructs that assembling more officers de-escalates a situation because the inmate knows he is outnumbered and has to give up.[1] By the time the four officers gathered, the inmate, Deandre Bradley, had been

---

[1] We have no reason to decide whether the de-escalation training program actually gives this advice or whether the practice is, in fact, de-escalatory.

left alone and handcuffed for twenty to sixty minutes, despite the Department rule.

Hundley's de-escalation tactics did not work. Bradley, who was protesting a lack of post-surgery medical supplies he believed he needed, continued to refuse to place his hands in the cuffing port after multiple requests, and became more belligerent, not less. When officers entered his cell to remove the handcuffs, he engaged in a flurry of aggressive and diso-bedient behavior, including at one point standing up from his wheelchair, taking a few steps, and then launching himself onto the ground and laying on top of the handcuffs.[2] He then detached and threw his catheter bag at the guards, struck a tactical shield, and broke an officer's radio. At this point Hundley determined that Bradley would have to be seen by medical staff to determine if he had been injured because the guards had used force in their efforts to remove the hand-cuffs. And because medical personnel ordinarily do not enter cells, Hundley decided that Bradley would have to be moved to the shower area. A struggle ensued, and when Bradley re-fused to cooperate with the move, the guards dragged him out of his cell, across a concrete floor, and into the shower area. There, Bradley grabbed and broke Kamp's duty belt. In response, Hundley sprayed Bradley with pepper spray. The officers tethered Bradley to the shower where he remained for approximately two hours until the medical unit arrived and examined him.

None of the officers disclosed in their respective incident reports that they had dragged Bradley to the shower, instead

---

[2] Bradley maintained some mobility and had a cane and a walker that he could use to stand and walk for a few steps.

stating that he had been "escorted." R. 48-2 at 1, 3, 8. In addition, Ochs wrote that Bradley went "kicking and swinging" during the "escort." R. 48-2 at 8. No video cameras recorded events inside Bradley's cell, but hallway cameras caught the officers dragging a motionless Bradley across the hallway.

After an internal investigation, followed by administrative hearings and an appeal to the Commission, the Department discharged the plaintiffs for violating a policy requiring officers to use force only as a last resort. The Commission concluded that the plaintiffs were aware of other options and had adequate time and opportunity to engage them but failed to do so before entering the cell and attempting to retrieve the handcuffs. The Commission also concluded that there was no risk of injury or destruction of property that required the officers to enter the cell urgently to retrieve the handcuffs. Finally, the Commission concluded that the plaintiffs' false statements in their reports were egregious and that the sum of the findings warranted termination.

The plaintiffs sued the acting warden of the facility, her administrative assistant, the investigator assigned to the incident, the Commission, the Department, its Acting Director, Chief Legal Counsel, and Chief of Operations. The suit, brought pursuant to 42 U.S.C. §1983, alleged that the defendants violated the plaintiffs' Fourteenth Amendment rights.[3] Specifically, the officers' complaint alleged that the Department's use of force rules were unconstitutionally vague such that the officers could not have known that their actions

---

[3] The plaintiffs brought a four-count complaint in the district court, but only the first count is at issue in this appeal. For that reason, several of the original defendants are no longer parties to this matter.

involving Bradley violated any Department rules or policies. The district court concluded, however, that the rules were not unconstitutionally vague and granted the defendants' motion for summary judgment—a ruling that we review de novo. *Russell v. Comstock*, 167 F.4th 984, 988 (7th Cir. 2026).

The keystone rule at issue in this case cabins the use of force by guards. The administrative code governing the Department and its operations of correctional facilities states that "[f]orce shall be employed only as a last resort or when other means are unavailable or inadequate and only to the degree reasonably necessary to achieve a permitted purpose." 20 Ill. Admin. Code §501.30(a), R. 57-1 at 721. The administrative code defines "force" as "physical contact used to coerce or prevent some action on the part of a committed person, and the use of chemical agents." 20 Ill. Admin. Code §501.20(a), R. 57-1 at 721. Similarly, a Department administrative directive states: "[T]he Department authorizes the use of force to extract an offender from a cell only as a last resort or when other means are unavailable or inadequate and only to the degree reasonably necessary to control the situation." Dep't Admin. Directive 05.01.173, R. 57-1 at 743. That directive further explains how a tactical force team can be deployed to extract inmates by using the minimal force necessary and requiring the team to video record the incident.

The Department also has rules relating to truthfulness in incident reports, requiring guards to "completely and accurately document any unusual incident that he or she observes." 20 Ill. Admin. Code §112.30(a), R. 57-1 at 713. The rules warn that "[e]mployees who knowingly provide false information shall be subject to disciplinary action, including termination of employment." 20 Ill. Admin. Code §120.95, R.

57-1 at 720; *see also* Dep't Admin. Directive 01.12.120, R. 57-1 at 731. ("[a]ny employee who knowingly provides false information, including but not limited to, false information provided in statements, incident reports, correspondence or an interview, shall be subject to disciplinary action, up to and including discharge.").

**II.**

The officers make many arguments on appeal that are not ours to consider. Thus, we begin our analysis in an unusual manner—by reciting what we will not resolve. We need not decide whether Bradley was a violent, belligerent, rule-breaking inmate, nor whether he behaved as the guards claim he did. We will assume these facts are true, as we must when reviewing a motion for summary judgment. *Raddant v. Douglas Cnty., Wis.*, 170 F.4th 583, 590 (7th Cir. 2026). Nor may we determine whether the prison rules are sensible; if the plaintiffs' plan was a better one than any of those contemplated by the rules; which other steps the officers could have or should have tried before resorting to force; or whether the supervising officers at the facility held a proper understanding or interpretation of the rules. Finally, we will not decide whether a different set of supervisors, administrators, or disciplinary boards might have concluded that these three correctional officers should not have been terminated. As a federal court, our role is not to manage the minutiae of employee rules and discipline. *See, e.g., Wilson v. AIM Specialty Health*, No. 23-3418, 2026 WL 1481216, at *6 (7th Cir. May 27, 2026) (noting that as a federal court, "[o]ur role is not one of a 'super-personnel department[ ]' second guessing employers' decision making). Our only task is to determine the constitutional question— that is, whether the defendants violated the due process rights

of the discharged officers by terminating them on the basis of a rule that was unconstitutionally vague.

To answer that question, we must evaluate whether the rule that says, in short, "do not use force except as a last resort" was so vague that the officers would not have been able to understand how to conduct themselves in order to comply with it. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). To survive a vagueness challenge, a law need not describe prohibited behavior with mathematical certainty but need only give a person of ordinary intelligence a reasonable opportunity to know what the rules prohibit. *Id.* at 108, 110. And when the rule is not one that is applicable to the general public, but rather regulates employee behavior, the government enjoys an even wider latitude. *Hicks v. Illinois Dep't of Corr.*, 109 F.4th 895, 904 (7th Cir. 2024). "Thus, a code of conduct for public employees is impermissibly vague only if it fails to 'convey adequate warning' to 'reasonable employees' as to a 'sufficiently defined range of inappropriate conduct' that may result in discipline." *Id.* (quoting *Greer v. Amesqua*, 212 F.3d 358, 369 (7th Cir. 2000)) (citation modified). Moreover, given the unique safety and security concerns, prison employers receive even "more latitude in their discipline decisions and personnel regulations than an ordinary government employer." *Id.* at 902.

*A. Vagueness challenge to the force-as-last-resort rules.*

The appellant officers are not alleging that the force-as-last-resort rules are facially vague—only that they are vague as applied to them. They do not explain, however, what it was about their circumstances that made the officers uniquely unable to understand the plain language of the rule. Under any circumstances, the term "last resort" leaves little, if any, room

for interpretation. It very clearly means "try all other reasonable methods first." Any reasonable officer would have to have known that there were at least a handful of options that could be attempted before resorting to force. In fact, the officer who investigated the incident in this case testified that the next step would have been for Hundley to notify his supervisor. That supervisor, in turn, stated that had he been called, he would have tried to talk to the offender to de-escalate the situation. And, in fact, Hundley's supervisor testified that, in a similar incident in the past, he had done just that—attempted to de-escalate through conversation before having to use pepper spray, as a last resort, when the offender turned violent. The Chief of Operations of the Department also testified that the officers did not exhaust other measures before resorting to force, noting that the officers could have shut the door and taken time to consult supervisors, or they could have activated the tactical team. The plaintiffs assert that inmates were not permitted to be handcuffed inside their segregation cell, and yet Hundley left Bradley handcuffed for twenty to sixty minutes while he gathered the other officers—time that the Commission concluded he could have spent seeking alternative solutions to the use of force.

Plaintiffs argue that they were not prohibited from entering Bradley's cell, they were not required to contact a supervisor before doing so, and were not required to call in the tactical team. All of this is correct, but irrelevant.[4] The plaintiffs

---

[4] The rules may have, in fact, required the officers to contact a supervisor before entering the cell of an inmate under these circumstances, but to paint the facts in the light most favorable to the plaintiffs, we can assume that they did not. The fact is simply irrelevant here because the

(continued)

were not terminated for those actions or failings. They conceded as much. *See* Reply Brief at 4–5 (noting that Hundley, Kamp, and Ochs were not charged with any violations of cell-extraction rules). They were terminated for failing to use force as a last resort.[5] All of these actions are simply examples of choices the plaintiffs could have made before using force. The defendants submitted these examples solely as support for the fact that the officers had other options before resorting to force; not because the officers were *required* to engage in any particular conduct. It is not our task to determine what would have been the best course of action. We conclude only that the

---

plaintiffs were terminated for failing to use force as a last resort, not for failing to contact a supervisor.

[5] In their reply brief the plaintiffs state that they were not charged with failing to use force as a last resort but instead were charged with failing to de-escalate the situation before entering the cell and with not obtaining the approval of a supervisor before entering the cell. Although Hundley's charge does not speak of excessive force, Ochs' and Kamps' most certainly does. *See* R. 57-1 at 706, 708, 710. But in any event, failure to de-escalate and failing to notify a supervisor are simply illustrations of the failure to attempt other solutions before resorting to force. Moreover, those may have been facts described in the initial charges, but they were not the words used in the final justification for termination. After a full hearing before an administrative law judge, and review of that decision by the Commission, the reasons for termination were made clear: The Commission determined that the officers should be terminated because they had "violated the Resort to Force standard under 20 Ill.Adm.Code 501.30(a) which prohibits [sic] the use of force 'only as a last resort or when other means are unavailable or inadequate... .'" R. 48-10 at 1. The Commission found that the officers "did not use force as a last resort" despite knowing of and having "adequate time and opportunity to utilize other means before entering the cell and attempting to retrieve the handcuffs from the offender," and despite the fact that there was no imminent risk of injury or destruction of property. *Id.*

Department did not violate the plaintiffs' due process rights by terminating them for failing to comply with what they allege was an unconstitutionally vague rule.

To sum up, the rule in this case provided fair, comprehensible warning that force should be used only as a **last** resort. And even if one might quibble about whether "last resort" means that officers must try any and all other options before resorting to force, this case is not at the margins. Although the officers commanded Bradley to place his hands into the cuffing port many times (all of which constitute "one resort," so to speak), before attempting any other means, they immediately moved on to a solution that involved five officers entering his cell with the intent of removing the handcuffs by attaching a "lead chain" to them and pulling Bradley's arms into the cuffing port—action that constituted force. They did so despite the fact that there was no evidence of an imminent threat to any person or property. In fact, the plaintiffs waited at least twenty, and possibly as long as sixty, minutes to enter the cell, during which time they could have consulted a supervisor, engaged the tactical team, or decided to wait longer for Bradley to cool off while they checked on his safety periodically. And indeed, once Bradley was tethered to the shower, he sat for two hours cooling off before he was moved again. We fail to see how the rule allowing force only as a last resort was vague as applied to these officers or this situation.

It is true, as the appellants point out, that the "Resort to Force" rules permit officers to use force to compel compliance with a lawful order given by an employee. 20 Ill. Admin. Code §501.40(a)(1), R. 57-1 at 722. But it allows that use of force only "to ensure the safety and security of the facility," and only as modified by the immediately preceding

subsection in the "Resort to Force" subpart. 20 Ill. Admin. Code §501.40(a)(1), R. 57-1 at 722. That is, only when it is a means of "last resort or when other means are unavailable or inadequate, and then only to the degree reasonably necessary to achieve a permitted purpose." 20 Ill. Admin. Code §501.30(a), R. 57-1 at 721. Otherwise, the allowance would swallow the rule against the use of force—permitting the maximum use of force for even the most minor of compliance refusals. Bradley's refusal to follow a lawful command did not make the force-as-last-resort rule inapplicable. Otherwise, what meaning would the rule have in the prison context?

Nor is it an excuse that the officers did not make physical contact with Bradley until he threw the catheter bag. The officers entered Bradley's cell with the purpose of using force—that is, physical contact to remove Bradley's handcuffs. That is the definition of "force" in the administrative rules. *See* 20 Ill. Admin. Code §501.20(a), R. 57-1 at 721 (defining force as "physical contact used to coerce … some action on the part of a committed person."); *see also* Testimony of Investigator Marc Hodge, R. 57-1 at 91 (explaining that the directive prohibiting force except as a last resort applies once officers enter a cell before exhausting other options). The officers engaged in their use-of-force plan not as a matter of last resort, but rather before exhausting other readily available options. The rules against the use of force are meant to prevent, among other things, just this type of escalation in the first place. The plaintiffs' premature decision to use force precluded opportunities for de-escalation.

B.  *The false incident reports.*

In addition to their vagueness claim regarding the use of force rules, the plaintiffs included the following two sentences

in their argument opposing summary judgment about the inaccuracies in their incident reports:

> The Defendants suggest that Hundley, Kamp, and Ochs were inaccurate in their written reports. Again, they fail to explain how they were inaccurate. They accurately described what had occurred, and the two top security officials testified to this.

Pls.' Resp. to Mot. for Summ. J., R. 57 at 49.

The district court dismissed the argument noting that there was no such claim in their complaint. It is true that complaints do not need to contain detailed allegations. *See* Fed. R. Civ. P. 8(a)(2) (A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief."). A complaint must however "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (citation modified). The complaint alleged only that the use-of-force rules were so vague as to violate due process and made no mention of the rules regarding truthful reporting. The district court therefore correctly determined that the matter was not before it on summary judgment.

And in any event, even if it were before the court, the officers' report contained a falsehood under any understanding. The rules are certainly not so vague that a prison officer of reasonable intelligence could not understand what was prohibited. They require officers to "completely and accurately document any unusual incident that he or she observes." The rules also give fair warning that providing false information

can lead to termination. *See* 20 Ill. Admin. Code §112.30(a), R. 57-1 at 713; 20 Ill. Admin. Code §120.95, R. 57-1 at 720; Dep't Admin. Directive 01.12.120, R. 57-1 at 731.[6]

Finally, because we determine that the "use force only as a last resort" rule is not unconstitutionally vague, we need not address the question of qualified immunity and thus, we AFFIRM the district court's grant of summary judgment in all parts.

---

[6] The plaintiffs also point to the testimony of two superior officers who testified that had the plaintiffs written that they dragged an inmate across the room, those superior officers would have asked the report-drafting guards to rewrite the sentence to avoid language that was "damaging to the department." R. 57-1 at 326. There is no evidence in the record, however, that anyone instructed the plaintiffs to use the word "escort" instead of "drag."